UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

In re:                                                                    Case No.: 08-37739 (CGM)

A.T. Reynolds & Sons, Inc.
d/b/a Leisure Time Spring Water,

                               Debtor.

-----------------------------------------------------X

WELLS FARGO BANK, N.A.,
RUSKIN MOSCOU FALTISCHEK, P.C.,

                         Appellants,               Case No.: 10-02917 (SCR)

         -against-

A.T. REYNOLDS & SONS, INC.,

                         Appellee.

-----------------------------------------------------X

---

## BRIEF OF APPELLANTS

---

Ruskin Moscou Faltischek, P.C.
Jeffrey A. Wurst, Esq.
Daniel L. McAuliffe, Esq.
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, New York 11556
516-663-6600
Attorneys for Appellants
Wells Fargo Bank, N.A. and Ruskin Moscou Faltischek, P.C.

479725

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION .......................................... 1

STATEMENT OF ISSUES ......................................................................................................... 1

STATEMENT OF THE STANDARD OF REVIEW .................................................................. 1

STATEMENT OF THE CASE AND THE FACTS .................................................................... 2

ARGUMENT .............................................................................................................................. 20

    1.    Whether the Bankruptcy Court applied an erroneous standard in holding the
Appellants in contempt of the Mediation Order by failing to participate at the
Mediation in good faith .............................................................................................. 20

    2.    Whether the Bankruptcy Court erred in determining that Wells Fargo sent a party to
the Mediation that did not have full settlement authority .......................................... 29

    3.    Whether the Bankruptcy Court erred in finding that the Appellants violated the terms
of the SDNY Standing Mediation Order and the Mediation Order. .......................... 32

    4.    Whether the Bankruptcy Court erred in hearing its own motion to hold the Appellants
in contempt for allegedly attending the Mediation in bad faith ................................ 40

CONCLUSION ........................................................................................................................... 47

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Badgley v. Santacroce,* 800 F.2d 33 (2d Cir. 1986), *cert. den.*, 479 U.S. 1067 (1987) ............... 22

*Bernard v. Galen Group, Inc*., 901 F. Supp. 778 (S.D.N.Y. 1995) ................................................. 42

*Bulkmatic Transp. Co. Inc. v. Pappas,* 2002 WL 975625 (S.D.N.Y. May 9, 2002) ........ 25, 33, 35

*Dan River, Inc. v. Crown Crafts, Inc.,* 1999 WL 287327 (S.D.N.Y. May 7, 1999) ..................... 35

*Dawson v. United States*, 68 F.3d 886 (5th Cir. 1995) ................................................................. 25

*Fisher v. SmithKline Beecham Corp.*, 2008 WL 4501860 (W.D.N.Y. Sept. 29, 2008) ......... 36, 37

*G. Heileman Brewing Co. Inc. v. Joseph Oat Corp.,* 871 F.2d 648 (7th Cir. 1989) ..................... 27

*Gray v. Eggert*, 248 Wis. 2d 99 (Ct. App. 2001) ......................................................................... 27

*Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114 (2d Cir. 1988) ......................... 27

*Hughes v. The Lillian Goldman Family*, 2000 WL 1228996 (S.D.N.Y. Aug. 30, 2000) ....... 37, 38

*In re Beard*, 811 F.2d 818 (4th Cir. 1987) ................................................................................... 45

*In re Chandler's Cove Inn, Ltd*., 74 B.R. 772 (Bankr. E.D.N.Y. 1987) ....................................... 45

*In re Chief Executive Officers Clubs, Inc.* 359 B.R. 527 (Bankr. S.D.N.Y. 2007) ................ 21, 22

*In re Forty-Eight Insulations, Inc.*, 84 B.R. 129 (Bankr. N.D. Ill. 1988) ..................................... 45

*In re Manville Forest Products Corp.,* 209 F.3d 125 (2d Cir. 2000) ............................................... 2

*In re Muller*, 851 F.2d 916 (7th Cir. 1988), *cert. den. sub. nom., Rogers v.*
    *First Nat. Bank of Peoria*, 490 U.S. 10076 (1989) ................................................................. 45

*In re Vebeliunas,* 332 F.3d 85 (2d Cir. 2003) ................................................................................ 1

*Integrated Resources, Inc. v. Ameritrust Co. Nat'l Ass'n* (*In re Integrated Resources, Inc.*),
    157 B.R. 66 (S.D.N.Y. 1993) ................................................................................................... 2

*King v. Allied Vision, Ltd.,* 65 F.3d 1051 (2d Cir.1995) ............................................................... 22

*Kothe v. Smith,* 771 F.2d 667 (2d Cir. 1985) ............................................................... 27

*Levin v. Tiber Holding Corp.,* 277 F.3d 243 (2d Cir. 2002) ........................................ 22

*Manley v. AmBase Corp.,* 337 F.3d 237 (2d Cir. 2003) ................................................ 2

*Monsanto Co. v. Haskel Trading, Inc.,* 13 F. Supp.2d 349 (E.D.N.Y. 1998) .............. 22

*Mordechai v. St. Luke's-Roosevelt Hospital Center,* 2001 WL 699062
   (S.D.N.Y. June 20, 2001) ......................................................................................... 35

*Negron v. Woodhull Hosp.,* 173 Fed. Appx. 77 (2d Cir. 2006) ............................... 33, 37

*New York State Nat. Org. for Women v. Terry,* 886 F.2d 1339 (2d Cir. 1989) ........... 22

*Nick v. Morgan's Foods, Inc.,* 99 F. Supp.2d 1056, 1062 (E.D. Mo. 2000),
   *aff'd,* 270 F.3d 590 (8th Cir. 2001) ........................................................................ 29

*Perez v. Danbury Hospital,* 347 F.3d 419 (2d Cir. 2003) ............................................ 22

*United States v. U.S. Gypsum Co.,* 333 U.S. 364 (1948) ................................................ 2

*Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163 (2d Cir. 2001) ........................................... 2

## United States Bankruptcy Code

28 U.S.C. § 157 ................................................................................................................ 1
28 U.S.C. § 158 ................................................................................................................ 1
28 U.S.C. §1334 ............................................................................................................... 1

## Federal Rules of Bankruptcy Procedure

Fed. R. Bankr. P. 5004(a) ............................................................................................. 43
Fed. R. Bankr. P. 8013 .................................................................................................... 2

## Federal Rules of Civil Procedure

Fed. R. Civ. Pro. 11(b) ................................................................................................. 28
Fed. R. Civ. Pro. 16(f) ............................................................................................. 35, 36

## Other Authorities

28 U.S.C.A. § 455(a), (b)(1) ......................................................................................... 43

Holly A. Streeter-Schaefer, *A Look at Court Mandated Civil Mediation*,
49 DRAKE L. REV. 367, 372 (2001). ......................................................................... 34

Robert A. Baruch Bush, *Staying in Orbit, or Breaking Free: The Relationship of
Mediation to the Courts Over Four Decades*, 84 N.D. L. REV. 705, 718 (2008)..................... 33

Douglas A. Henderson, *Mediation Success: An Empirical Analysis*, 11 OHIO ST. J. ON DISP.
RESOL. 105, 127 (1996) ............................................................ 33

John Lande, *Using Dispute System Design Methods to Promote Good-Faith Participation
in Court-Connected Mediation Programs*, 50 UCLA L. REV. 69, 86 (2002) ............. 34, 35, 39

7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 37.51 (3d ed. 2006)... 22

Local Bankruptcy Rule 9019(e)............................................................................. 40

BLACK'S LAW DICTIONARY 996 (8th ed. 2004) ........................................................ 33

## I.  PRELIMINARY STATEMENT

This is an appeal (the "Appeal") from the Opinion and Order Sanctioning Wells Fargo Bank, N.A. ("Wells Fargo") for Failure to Comply with General Order M-211 and Order Directing Parties to Mediation, dated February 5, 2010 (the "Order Appealed From"), issued by Hon. Cecelia G. Morris (the "Bankruptcy Judge"), United States Bankruptcy Judge, Southern District of New York (the "Bankruptcy Court"), in Case No. 08-37739.

## II.  STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The Bankruptcy Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  The United States District Court for the Southern District of New York has jurisdiction over the instant appeal pursuant to 28 U.S.C. § 158.

## III.  STATEMENT OF ISSUES

1.      Whether the Bankruptcy Court applied an erroneous standard in holding the Appellants in contempt of the Mediation Order by failing to participate at the Mediation in good faith.

2.      Whether the Bankruptcy Court erred in determining that Wells Fargo sent a party to the mediation that did not have full settlement authority.

3.      Whether the Bankruptcy Court erred in finding that the Appellants violated the terms of the SDNY Standing Mediation Order and the Mediation Order.

4.      Whether the Bankruptcy Court erred in hearing its own motion to hold the Appellants in contempt for allegedly attending the mediation in bad faith.

## IV.  STATEMENT OF THE STANDARD OF REVIEW

On appeal, the District Court reviews the Bankruptcy Court's conclusions of law *de novo*. *In re Vebeliunas,* 332 F.3d 85, 90 (2d Cir. 2003).  Questions of law, including the correctness of

a legal standard applied, are subject to plenary review. *In re Manville Forest Products Corp.,* 209 F.3d 125, 127 (2d Cir. 2000).

Findings of fact are reviewable under the clearly erroneous standard. Fed. R. Bankr. P. 8013.[1] A finding is clearly erroneous when, despite evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States v. U.S. Gypsum Co.,* 333 U.S. 364 (1948). The bankruptcy court abuses its discretion when "no reasonable man could agree with the bankruptcy judge's decision." *Integrated Resources, Inc. v. Ameritrust Co. Nat'l Ass'n* (*In re Integrated Resources, Inc.*), 157 B.R. 66, 70, 72 (S.D.N.Y. 1993). A court abuses its discretion where the court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. *Manley v. AmBase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003). The finding is clearly erroneous when a court's "decision-though not necessarily the product of a legal error or a clearly erroneous factual finding-cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir. 2001).

## V.    STATEMENT OF THE CASE AND THE FACTS

### 1.    Background

On or about April 28, 2006, A.T. Reynolds & Sons, Inc. (the "Debtor") and Wells Fargo entered into that certain Credit and Security Agreement, together with other loan documents pursuant to which Wells Fargo made loans and advances to or for the benefit of the Debtor which was secured by all of the Debtor's personal property together with the proceeds thereof, as well as a mortgage securing the real property owned by the Debtor where it operated its business.

---

[1] Fed. R. Bankr. P. 8013 states: "[o]n an appeal the district court or bankruptcy appellate panel may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

On December 5, 2008, the Debtor filed a voluntary petition with the Bankruptcy Court for relief under Chapter 11 of Title 11 of the United States Code (the "Case").  As of the Petition Date, the Debtor was indebted to Wells Fargo in the approximate amount of $2.4 million, plus interest, costs, and expenses.  No trustee or examiner was appointed, and Debtor remained in possession of its assets as a debtor-in-possession.  On or about December 16, 2008, the Bankruptcy Court issued the Interim Order Authorizing Debtor-In-Possession to Use Cash Collateral of and Grant Security Interest to Wells Fargo Bank, N.A., Pursuant to Section 363(c)(2) and 364(c) (the "First Interim Order") (Docket No. 31).[2]  Pursuant to the consensual First Interim Order, the Debtor was authorized to use Wells Fargo's cash collateral pursuant to an agreed upon formula and was obligated to provide Wells Fargo with certain reports and documentation, including, but not limited to, cash flow projections, budgets, account receivable agings, and other documentation that Wells Fargo would use to monitor its collateral position (the "Reporting").  (First Interim Order ¶¶ 3, 4, 6).  In consideration of Wells Fargo's allowing for the Debtor to use Wells Fargo's cash collateral, Wells Fargo was granted a first priority lien in and to substantially all of the Debtor's assets.  (First Interim Order ¶ 7).

The Debtor failed to comply with the terms and conditions contained in the First Interim Order by its failure to provide Wells Fargo with accurate reporting as well as its failure to make payments of certain administrative obligations in accordance with its own budgets.  Amongst the obligations which the Debtor failed to pay were adequate assurance payments to NYSEG in the amount of $35,256.00.  Notwithstanding the Debtor's failure to abide by the terms of the First Interim Order, after extensive negotiations, Wells Fargo, the Debtor, the Official Committee of

---

[2]   The Debtor filed the Case without Wells Fargo's knowledge, and had initially been using cash collateral in violation of the Bankruptcy Code.  By Order dated December 12, 2008, the Bankruptcy Court enjoined any further use of the cash collateral pending further Order.  The First Interim Order was negotiated with, and consented to by, Wells Fargo.

Unsecured Creditors (the "Committee"), and the Office of the United States Trustee (the "Trustee") negotiated a Second Interim Order Authorizing Debtor-In-Possession to Use Cash Collateral of and Grant Security Interest to Wells Fargo Bank, N.A., Pursuant to Section 363(c)(2) and 364(c) of the Bankruptcy Code, entered on January 30, 2009 (the "Second Interim Order") (Docket No. 72).

Following continued increasing losses by the Debtor, the Debtor's failure to have complied with budgets and pay certain expenses pursuant to the Second Interim Order, and inability to continue as an ongoing concern, on February 26, 2009, Wells Fargo filed a Motion to Convert Chapter 11 Case to Chapter 7 and Granting Wells Fargo Bank, N.A. Relief from the Automatic Stay (the "Conversion Motion") (Docket No. 90).  Wells Fargo agreed to adjourn the Conversion Motion (ultimately withdrawing it after the sale), and instead negotiated with the Debtor and Committee an Amended Second Interim Order Authorizing Debtor-In-Possession to Use Cash Collateral of and Grant Security Interest to Wells Fargo Bank, N.A., Pursuant to Section 363(C)(2) and 364(C) of the Bankruptcy Code, entered by the Bankruptcy Court on March 6, 2009 (the "Amended Second Interim Order") (Docket No. 112).  By its terms, the Amended Second Interim Order directed the Debtor to file and serve a motion (the "Sale Motion") to sell substantially all of its assets on or before March 11, 2009.  The hearing on the Sale Motion was set to be held on March 27, 2009 (the "March 27 Hearing").

The Sale Motion did not propose a *stalking horse* bidder, but instead, invited open bidding in an auction-like sale.  Accordingly, prospective purchasers appeared at the Bankruptcy Court at the March 27 Hearing, resulting in a recommendation by the Debtor, the Committee, and Wells Fargo to approve a sale of substantially all of the Debtor's assets to Boreal Water Collection, Inc. ("Boreal").  Wells Fargo consented to the sale to Boreal even though: (a) the

proceeds to be realized from the sale were insufficient to fully satisfy the Debtor's obligations owing to Wells Fargo; and (b) in order to effect its purchase Wells Fargo would need to lend Boreal substantially all of the purchase price (the "Boreal Loan").[3]  (3/27 Transcript 19:19-25; 20:1-9).

At the March 27 Hearing, New York State Electric and Gas Corporation ("NYSEG") also appeared on its own motion to compel payment of the amount of $35,256.23 (the "Utility Payment"), absent which it would terminate the power at the Debtor's premises the following business day.  (3/27 Transcript 37:22-24; 38:1-17).  As a result of the Debtor's failure to have made the previously agreed upon payments to NYSEG totaling approximately $3,600, the entire indebtedness to NYSEG became immediately due and payable.  *See* Objection Of New York State Electric And Gas Corporation To The Debtor's Motion For An Order (I) Approving Method Of Furnishing Adequate Assurance Of Payment For Utility Services, (II) Establishing Further Procedures Pursuant To Section 366(b) Of The Bankruptcy Code, And (III) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Utility Services Pursuant To 11 U.S.C. § 366 (the "NYSEG Objection") at ¶¶ 7, 9  (Docket No. 153).  If payment were not made, NYSEG threatened to cut off power to the Debtor's premises.

The parties at the hearing acknowledged that if the power were to be turned off, the Debtor's assets would be damaged and the sale to Boreal would be placed at risk.  The Debtor lacked the funds to make any payment to NYSEG.  (3/27 Transcript 65:17-18 ("[The Debtor doesn't] have $35,000")).  Accordingly, there were extensive discussions and attempts at *creative solutions*, both before the Bankruptcy Court and during various recesses. (3/27 Transcript 21:9-16; 38-45; 62-67).

---

[3] "3/27 Transcript ____" refers to the page of the Transcript of Hearing on 3/27/09 designated by Appellants as an item to be included in the record on appeal.

Ultimately, Wells Fargo volunteered to advance the Utility Payment, after Boreal agreed to a slight increase in the interest rate it was to pay Wells Fargo on the Boreal Loan and Wells Fargo's counsel agreed to an adjustment of its legal fees. The arrangement as to how the Utility Payment would be made was stated generally on the record by counsel to Wells Fargo. (3/27 Transcript 68:2-19). It should be noted that Wells Fargo was not under any obligation to advance the Utility Payment. Rather, when it was disclosed that the Debtor failed to make required payments to NYSEG pursuant to Section 366 of the Bankruptcy Code, and that such failure placed the sale to Boreal at risk, and, thus, risked further deterioration in the value of Wells Fargo's Collateral, Wells Fargo volunteered to advance the Utility Payment in order to avoid the risk of losing the sale to Boreal.

On March 30, 2009, Wells Fargo did, in fact, make payment to NYSEG.[4] (McAuliffe Affidavit ¶ 7). In order for Wells Fargo to properly account for the Utility Payment internally on its own books, it entered the payment as a debit against the already deficient account of the Debtor, fully recognizing that the Debtor was unable to make the payment or to reimburse Wells Fargo for doing so. Wells Fargo knew that by making the Utility Payment it was <u>increasing its loss</u> on its loan to the Debtor by the amount of $35,256.23. Thus, as indicated in the record of the March 27 Hearing, Wells Fargo was making the payment out of its own "pocket." (3/27 Transcript 65:17-18).

At the conclusion of the March 27 Hearing it was determined that the closing of the sale to Boreal was to take place one week following the March 27 Hearing. The Amended Second Interim Order, by its own terms, was to expire on March 27, 2010. Accordingly, Wells Fargo

---

[4] Through its Response Brief (defined below), Wells Fargo attached as Exhibits the Affidavit of Jeffrey A. Wurst, Esq. (the "Wurst Affidavit"), Affidavit of Robert Ostrowe (the "Ostrowe Affidavit"), Affidavit of Evan Zwerman (the "Zwerman Affidavit") and the Affidavit of Daniel L. McAuliffe, Esq. (the "McAuliffe Affidavit"). Annexed as Exhibit "B", "C" and "D" to Wurst Affidavit is the string of emails seeking to establish a date for the Mediation and to identify the issues that were to be mediated (the "Email String").

suggested that cash collateral use be extended and the Bankruptcy Court entered the Second Amended Second Interim Order Authorizing Debtor-In-Possession to Use Cash Collateral of and Grant Security Interest to Wells Fargo Bank, N.A., Pursuant to Section 363(C)(2) and 364(C) of the Bankruptcy Code ("Second Amended Second Interim Order") (Docket No. 169).   The Second Amended Second Interim Order extended the Amended Second Interim Order through the closing sale to Boreal to be held on or about April 3, 2009, but no later than April 6, 2009.

Boreal closed on its acquisition of the Debtor's assets on April 3, 2009, the same day the order approving such sale was entered (Docket No. 175).   By virtue of the closing of the sale, the Second Amended Interim Order expired on April 6, 2009.   Although the sale resulted in Wells Fargo recovering a significant amount of the obligations owed to it by the Debtor, it did suffer a loss.   Thereafter, with the sale effected, and with the Second Amended Second Interim Order expiring by its own terms on April 6, 2009, Wells Fargo's interest in this Case terminated, and Wells Fargo and its counsel ceased attending or actively monitoring the remaining activities in this Case.

**2.      Events Leading to Mediation**

On or about July 8, 2009, Boreal brought a Motion for Allowance and Payment of Administrative Claims for Wages (the "Wage Claim") (Docket No. 203).   Although Wells Fargo's counsel received electronic notice of the Wage Claim, it did not submit any papers nor appear on such motion, which did not seek any relief against Wells Fargo but, instead, appeared to be only a dispute between Boreal and certain professionals retained in the Case.   The Debtor did not oppose the Wage Claim, nor did any other party, and on July 21, 2009, the Bankruptcy Court entered an order (the "Wage Claim Order") approving the Wage Claim (Docket No. 210). Subsequently, the Debtor filed a motion to reargue and/or reconsider the Wage Claim Order (the

"Motion to Reconsider") (Docket No. 211).  The Motion to Reconsider included arguments that (i) the wage claimants had already been paid, and, thus, there was no claim against the estate; and (ii) to the extent the Wage Claim were to be allowed, such claim should be paid *pari passu* with the professionals of the estate, as only limited funds were available.  *See* Motion to Reconsider at ¶¶ 12, 19-20.  The determination of the Motion to Reconsider was set for August 25, 2009 (the "August 25 Hearing").

Inasmuch as no relief had been sought against Wells Fargo, Wells Fargo did not appear at the August 25 Hearing.[5]  During the August 25 Hearing, Debtor's counsel stated that "there was an account that was set aside and there is a fund which is still being held that would be divided up, theoretically between the remaining parties [Debtor's counsel, Debtor's financial adviser, Committee counsel]."  (8/25 Transcript 7:9-11).  With respect to payment from such fund, the Debtor's counsel expressed his concerns that the Wage Claim would be paid ahead of the professionals.  (8/25 Transcript 6:18-19).  Debtor's counsel argued, instead, that the Wage Claim should be *pari passu* with the claims of the professionals, rather than the Wage Claim being paid first.  (8/25 Transcript 7:1-3).  Other than this remaining fund, the Case was administratively insolvent.  (8/25 Transcript 7:8-9).  Boreal's attorney (apparently ignoring the fact that the Debtor had lacked the funds to pay the Utility Payment) erroneously alleged that Wells Fargo used the Debtor's funds to make the Utility Payment, resulting in the Debtor not having available funds to pay the Wage Claim.  (8/25 transcript 8:9-23).  Although Debtor's attorney claimed that Boreal's argument "suffers from some serious causation issues", the Debtor proposed mediation so that all parties could come together to "hash it out."  (8/25 Transcript 9:12, 7:19-20).

---

[5]  Following the mediation and in preparing its opposition to the instant allegations of a lack of good faith, Wells Fargo obtained a copy of the transcript of the August 25 Hearing and learned for the first time what precipitated the order referring mediation.

On August 27, 2009, the Bankruptcy Court entered the Order Assigning Disputed Matter to Mediation and Setting Mediation Deadlines (the "Mediation Order") (Doc. No. 224). The Mediation Order provided that the Debtor, Boreal, CCV Restructuring ("CCV"), as financial advisor to Debtor, counsel to the Committee ("Committee Counsel"), and Wells Fargo (together, the "Mediation Parties") attend the mediation (the "Mediation").

Neither Wells Fargo nor its counsel was aware of the basis to have included Wells Fargo in the Mediation inasmuch there was no complaint or motion containing any prayer for relief against Wells Fargo, nor any other documentation expressing the basis of any legal claim against Wells Fargo. Nevertheless, Wells Fargo awaited the appointment of a mediator so it could fully address the issues to be heard at the Mediation.

On September 24, 2009, an order was issued appointing Robert M. Goldman (the "Mediator") as the mediator (Docket No. 227). It was at this time that email exchanges between the Mediation Parties commenced seeking to (a) establish a date for the Mediation, and (b) at the request of Wells Fargo, for the Mediation Parties to identify the issues that were to be mediated. Only the Debtor's counsel was responsive to Wells Fargo's inquiry to identify issues subject to the Mediation, responding as follows:

> The issues to be mediated, include, but are not limited to:
>
> 1. Whether Wells Fargo represented to the Court at the 363 sale of the debtor's business that the utility bill would be paid by Wells;
>
> 2. Whether there was any agreement between Boreal and Wells, as alleged by Boreal, to have an additional interest point paid by Boreal to Wells at the 363 closing to make sure the Utility was paid, if that point was paid, how it was applied;
>
> 3. Whether Wells (intentionally or otherwise) double dipped by taking both the point from Boreal and by sweeping the

Debtor's cash collateral account to pay the same Utility bill, which resulted in insufficient funds to pay wages to debtors employees;

4.     Whether Wells violated the cash collateral order, and/or breached its deal with Boreal in so doing; and

5.     Why Wells has not yet funded the carve out to the Unsecured Creditors Committee (unless it has done so).

*And, any other issues anyone wants to discuss of course.*  (emphasis added)

(Wurst Affidavit, Exhibit "B", Email String).

Curiously, no mention of the priority status of the Wage Claim was mentioned.

Pursuant to the Mediation Order, each of the Mediation Parties was asked to submit a confidential statement to the Mediator outlining its position.  In anticipation of preparing its confidential statement (the "Confidential Statement"), Wells Fargo expressed its concern that although it was prepared to address in its Confidential Statement the five points identified by Debtor's counsel, it was impossible to address "and any other issues anyone wants to discuss of course", unless such "other issues" were identified by the other Mediation Parties.  (Wurst Affidavit ¶23).  No "other issues" were enumerated by the other Mediation Parties, and the deadline approached for the submission of its Confidential Statement.  Accordingly, Wells Fargo's counsel indicated that it could only address those issues enumerated and would address any "other issues" at the Mediation only if it felt it could do so without preparation.  (Wurst Affidavit, Exhibit "D", Email String).

Through email communication, the Mediator responded that the proceedings would not be limited to the items enumerated and acknowledged that he did not have any information on the controversy, but would learn it from the submissions, each of which was to be *ex parte*. (Wurst Affidavit ¶ 24).  Although concerned about the effectiveness of a Mediation with no

boundary lines, Wells Fargo, nevertheless, prepared and submitted its Confidential Statement solely addressing the five items enumerated by Debtor's counsel.  (Wurst Affidavit, Exhibit "D", Email String).   The Mediator, *sua sponte*, adjourned the Mediation, and rescheduled it for November 17, 2009.  (Wurst Affidavit ¶ 26; Exhibit "C", Email String).

The Mediator was required to submit his report (the "Mediator's Report") to the Bankruptcy Court without having it filed on the ECF system or docketed. (11/17 Transcript 10:21-23). Based upon the Mediator's Report, the Bankruptcy Court moved, *sua sponte*, by Order to Show Cause why Wells Fargo should not be held in contempt and sanctioned.  The Bankruptcy Court relied upon certain assertions contained in the Mediator's Report in making its findings. (Opinion at 5-7; Mediator's Report[6], at 3-7 (explaining that: (1) Mr. Wurst "was having difficulty in understanding the issues to be addressed" and was concerned that how the Mediation was progressing would result in a "free for all"; (2) Mr. Wurst "did not appear but sent a 'junior' [attorney] . . . [and the Wells Fargo representative was] another 'junior' Evan Zwerman, who's [sic] job description was 'relationship manager' at Wells Fargo"; and (3) that the Appellants "came prepared only to repeat a pre-conceived mantra that Wells Fargo was not open to any compromise that would involve 'taking a single dollar out of their pocket'")).

### 3.      The Mediation

The Mediation Order required that each of the Mediation Parties be represented by a responsible person.   However, prior to the Mediation, Wells Fargo learned from Boreal (its borrower), that the principal of Boreal would not be attending the Mediation.  Mr. Wurst brought this to the attention of the Mediator and the other Mediation Parties, and requested confirmation

---

[6]  The Court directed the Mediator to submit the Mediator's Report to chambers but not file it on the ECF system.  Accordingly, we were advised by the Clerk's office that the Mediator's Report would not be available for the Record on this Appeal.   So as not to violate the Bankruptcy Court's directive, we have not annexed the Mediator's Report to this brief yet remain ready to do so upon the direction of this Court.

from Boreal's counsel of his client's attendance.   Boreal's counsel never responded to Mr. Wurst's inquiries.   The combination of Wells Fargo having been told that the principal was not attending and the lack of response regarding a Boreal attendee increased Mr. Wurst's concerns, and he repeatedly sought assurance that the principal would attend.   Ultimately, Wells Fargo's concerns came to fruition when the owner of Boreal failed to attend the Mediation.

The Mediation was held on November 17, 2009 at the United States Bankruptcy Court for the Southern District, in its Poughkeepsie courthouse.   In addition to the Mediator, the Mediation was attended by Nicholas A. Pascale, Esq. and Michelle Rider, Esq., each of the firm of Tarshis Catania Liberth Mahon Milligram, PLLC, as counsel to the Debtor; Lance N. Portman, Esq. of the firm of McCabe & Mack LLP, counsel to Boreal, and Vivian M. Faliski, the controller/bookkeeper for the Debtor, and at the time serving in that same capacity for Boreal;[7] Wayne Day of CCV; and Evan Zwerman ("Mr. Zwerman"), a Vice President of Wells Fargo, together with Daniel L. McAuliffe, Esq. ("Mr. McAuliffe", together with Mr. Zwerman, the "Wells Fargo Representatives"), of the firm of Ruskin Moscou Faltischek, P.C. ("RMF"), as counsel to Wells Fargo.

Mr. Zwerman is Vice President of Wells Fargo with over ten years of experience. (Zwerman Affidavit ¶ 2).   Mr. Zwerman was the relationship manager for both the A.T. Reynolds loan and the Boreal loan.   Among his various responsibilities, Mr. Zwerman handles the day-to-day functions of the loans he manages, approves loan advances and conducts financial and credit analysis.   (Zwerman Affidavit ¶ 6; 12/31 Transcript 31:8-11).   In addition, Mr. Zwerman had full settlement authority up to the known amount in controversy at the Mediation. (Zwerman Affidavit ¶ 6; Ostrowe Affidavit ¶¶ 6, 7).   Mr. McAuliffe is a senior attorney at RMF

---

[7]  It is uncertain in what capacity Ms. Faliski was in attendance, whether as a representative of the Debtor or of Boreal.  In either case, Wells Fargo asserts that she lacked any authority to settle any issues related to Wells Fargo, the Debtor and Boreal.

with over ten years of experience practicing law.  He commenced his career as a law clerk to the Hon. Stephen A. Stripp, former United States Bankruptcy Judge for the District of New Jersey. He was admitted to practice in the Commonwealth of Pennsylvania in 2000, the State of New Jersey in 2000 and the State of New York in 2002.  He is also admitted to practice in the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Pennsylvania and the District of New Jersey, as well as before the Second and Third Circuit Courts of Appeal.  (Wurst Affidavit ¶ 14).

At the Mediation, the Mediator never asked the attendees to identify themselves.  This became apparent as the Mediator's Report (defined below) incorrectly assumed that both the Debtor and Boreal were represented by responsible businesspersons, and was unaware of the identities and roles of certain of the attendees.  The Mediator's Report states:

> Suffice it to say, the mediation proceeded on November 17, 2009, **the debtor and her counsel appeared\*,** as did the attorney for the unsecured creditors committee, and Wayne Day…..Mr. Portman and his client, **the owner of Boreal appeared.**\*\*  Mr. Wurst did not appear, but instead sent a "junior", Daniel McAuliffe, nor the person previously identified as the Wells party representative (Mark Long) but another "junior" Evan Zwerman, who's (*sic*) job description was "relationship manager" at Wells Fargo.

> (Mediator's Report at page 5)  (Emphasis added).

> \**Apparently confusing Ms. Rider for the Debtor's "party representative."*

> \*\**Apparently mistaking Ms. Faliski, the controller, for Francine Lavoie,* the *President/CEO and "owner" of Boreal.*

At the outset of the Mediation, each of the parties presented a short summary of their mediation positions. At one point, an assumption was stated on a fundamental point upon which Mr. McAuliffe disagreed.  He expressed his view, which led to a discussion on the topic, and

shortly thereafter, the first break-out session of the Mediation, with the Wells Fargo Representatives joining the Mediator in a separate room.

The Wells Fargo Representatives spent a significant portion of the session in break-out with the Mediator.  In the end, the Mediator was unable to persuade Wells Fargo of the risk of any legal liability, and Wells Fargo was unable to move the Mediator from certain preconceptions he had regarding fundamental issues.  (McAuliffe Affidavit ¶¶ 6-7, 9-11).  In fact, at no time during the Mediation was any legal theory of liability presented to Wells Fargo. For instance, <u>Wells Fargo stated in no uncertain terms that it did not sweep the cash collateral account to make the Utility Payment, and furthermore that the Debtor lacked funds in the account to have even covered such payment</u>.  This fact was recognized at the time by the Bankruptcy Court.  (3/27 Transcript 65:17-19 ("[The Debtor does not] have $35,000.")). Nonetheless, the Mediator's Report reflects the following amongst its "underlying facts": "[Wells Fargo] essentially **emptied the cash collateral** account of the debtor and, inter alia, reimbursed itself for the $35,722.61 outlay…."  (Mediator's Report at page 2) (emphasis added). Similarly, the Mediator testified of the "issue as to whether or not Wells Fargo had the **right to sweep the . . . collateral account**."[8]  (12/31 Transcript at 80:12-14) (emphasis added).  <u>The Mediator was relying upon alleged facts for which no evidence was shown and, **_simply were not true_**</u>.  This disconnect between Wells Fargo and the Mediator evidences the inability of Wells Fargo and the Mediator to have had productive discussions.

Wells Fargo challenged the Mediator's assertions as being fundamentally flawed and the Mediator alleged that Wells Fargo was not participating in good faith.  A status conference in the Case had been scheduled before the Bankruptcy Court for the same day and the Mediation

---

[8]  "12/31 Transcript ____" refers to the page of the Transcript of Hearing on 12/31/09 designated by Appellants as an item to be included in the record on appeal.

Parties appeared before the Bankruptcy Court, whereupon the Mediator was invited into the courtroom where he reported his allegation of bad faith.  The Bankruptcy Judge stated that the repercussions of a finding of a lack of good faith are "draconian and has consequences"[9] (11/17 Transcript 7:25; 8:1-17), and requested that a written report (the "Mediator's Report") be prepared and submitted to chambers without having it filed on the ECF system or docketed. (11/17 Transcript 10:21-23).  Upon Wells Fargo's inquiry regarding an opportunity to respond to the allegations, the Bankruptcy Judge stated:

> No.  There would not be an opportunity to respond to that . . . It's a mediator's report that there was no good faith.  There is not an opportunity to respond to that.  The opportunity is to go back out and mediate.

(11/17 Transcript 10:21-23).

The parties all agreed to continue the Mediation.  Prior to resuming discussions with the Mediator, Mr. McAuliffe borrowed the Mediator's phone to contact his office to discuss the appearance before the court, the allegations of the Mediator, and the Bankruptcy Judge's position that Wells Fargo would not be afforded an opportunity to respond to the Mediator's allegations of bad faith.  (McAuliffe Affidavit ¶ 12, fn. 2).

The Mediation then resumed, with the Wells Fargo Representatives in a break-out session with the Mediator, and subsequently in discussions between themselves.  Ultimately, Wells Fargo agreed to offer $5,000 to settle the matter - approximately 20% of the Wage Claim. (12/31 Transcript 89:20-25, 90:1-2).  *See* Mediator's Report, at page 5 (stating the "amount in controversy was something less than $20,000").  This offer was presented to the Mediation Parties and rejected.  For reasons that were not – and could not – be explained, the Mediator felt as if Wells Fargo's offer "exacerbated the feeling of bad faith." (12/31 Transcript 96:10-11).

---

[9]  "11/17 Transcript ____" refers to the page of the Transcript of Hearing on 11/17/09 designated by Appellants as an item to be included in the record on appeal.

The Mediation Parties then re-appeared before the Bankruptcy Judge, and the Bankruptcy Court directed the Mediator to submit its report to chambers as a hard copy and not for ECF (11/17 Transcript 10:20-23), detailing and describing the circumstances that gave rise to the determination that a party failed to participate in good faith.

The Mediator's Report dated November 27, 2009, alleged that Wells Fargo failed to participate at the Mediation in good faith when Wells Fargo questioned whether a pleading in support of the Mediation needed to filed with the Court; asked what party representatives of the other Mediation Parties would attend; appeared and participated in the Mediation by a "junior" representative and "junior" counsel; and finally that Wells Fargo attended the Mediation only to repeat a pre-conceived mantra that they would not be willing to compromise their legal position. It is these allegations which formed the basis for the Bankruptcy Court to move *sua sponte* by Order to Show Cause why Wells Fargo should not be held in contempt and sanctioned. (Mediator's Report, at pages 3-7).[10]

On December 3, 2009, the Bankruptcy Court issued its Order to Show Cause why Wells Fargo and its counsel should not be sanctioned for contempt of General Order 390 and the Mediation Order (the "12/3 Order to Show Cause") (Docket No. 231).  The 12/3 Order to Show Cause also provided a briefing schedule for the parties to address the allegations that Wells Fargo and counsel failed to participate in good faith, and required the appearances of Wells Fargo, Wells Fargo's counsel (together with Wells Fargo, the "Appellants"), and other parties on

---

[10]   The Mediator claimed: (1) "Wells Fargo stated they were 'at a loss to fully understand the issues at hand' or 'the nature of the mediation' regarding the issues to be mediated and demanded a separate written pleading to be filed with the court of the issues to be addressed in mediation[;]" (2) Mr. Wurst "asked for his personal assurance that Boreal would have a party representative present[;]" (3) Mr. Wurst "did not appear but sent a 'junior' [attorney] . . . [and the Wells Fargo representative was] another 'junior' Evan Zwerman, who's [*sic*] job description was 'relationship manager' at Wells Fargo[;]" and (4) that the Appellants "came prepared only to repeat a pre-conceived mantra that Wells Fargo was not open to any compromise that would involve 'taking a single dollar out of their pocket")."

December 31, 2009 at 10:00 a.m. to show cause why sanctions should not be imposed.[11]

On December 15, 2009, Wells Fargo filed its opposition to the 12/3 Order to Show Cause, articulating Wells Fargo's position that it attended the Mediation in good faith, that the Wells Fargo Representatives undoubtedly possessed full authority to settle the matter at hand, and that the nature of the communication preceding the Mediation referred solely to the Mediation Parties' scheduling availability, identification of issues, and assurance that each party would be represented at the Mediation by a person with authority (the "Response Brief") (Docket No. 236).

### 4.     The December 31, 2009 Hearing

On December 31, 2009, the Bankruptcy Court held a hearing regarding the Court's *sua sponte* Order to Show Cause and Motion for Sanctions (the "12/31 Hearing").[12]  As provided in the Clarified Order to Show Cause, the attendees on behalf of Wells Fargo and its counsel included (i) a "senior officer of Wells Fargo", Robert Ostrowe, who is a Senior Vice President, (ii) a "partner of Ruskin Moscou Faltischek, P.C.", Douglas Cooper, Esq., Managing Partner, and (iii) Daniel McAuliffe, Esq.  From the outset of the 12/31 Hearing, it became obvious that the Bankruptcy Judge had formed an opinion that Wells Fargo had acted improperly, without yet

---

[11]   After receiving the 12/3 Order to Show Cause, the Appellants, recognizing the Mediation Parties' traveling schedule during the holiday season, sought and received consent from all the Mediation Parties seeking an adjournment of the case until January 12, 2010 at 12:00 p.m. (the "Adjournment").  To schedule the Adjournment, RMF placed a telephone call to the Bankruptcy Court and submitted a letter addressed to the Bankruptcy Court dated December 7, 2009 (Docket No. 232).  However, despite unanimous consent of the Mediation Parties and consideration of the travel plans during the holiday season, the Bankruptcy Court nonetheless denied the request for an adjournment on December 8, 2009 (Docket No. 233).  In its cover letter forwarding its opposition to the Bankruptcy Court, Wells Fargo reiterated its request for an adjournment to accommodate vacation schedules.  In response, the Bankruptcy Court issued a Clarified Amended Order to Show Cause on December 17, 2009 (the "Clarified Order to Show Cause") (Docket No. 237).  Among the changes set forth by the Clarified Order to Show Cause, the Bankruptcy Court ordered "that a senior officer of Wells Fargo appear" and that "a partner of Ruskin Moscou Faltischek P.C. and Daniel L. McAuliffe, Esq. appear . . . ."

[12]   In attendance at the Hearing was Mr. Zwerman, Mr. Ostrowe, and Mark Long from Wells Fargo; Douglas Cooper, Esq. and Mr. McAuliffe, on behalf of RMF serving as counsel to Wells Fargo; Lance Portman, Esq., counsel to Boreal; Nicholas Pascale, Esq., counsel to the Debtor; and the Mediator.  Mary Seymour, Esq., counsel to the Committee appeared by telephone.

hearing any testimony and notwithstanding Wells Fargo's denials of any wrongdoing in opposition papers.  The Bankruptcy Judge, in fact, characterized Wells Fargo's response as "disconcerting", "ingenuous and un-incredible", and the factual statements therein as having been set forth "inartfully and not very nice."  (12/31 Transcript 4:23-24, 5:13).  The ill-feelings held by the Bankruptcy Judge towards Wells Fargo's counsel was further shown in response to Mr. Cooper's delivery of Mr. Wurst's regrets on his inability to attend the hearing, by the Bankruptcy Judge's response that such regrets were "not well received."  (12/31 Transcript 7:22).  Not long thereafter, Mr. Cooper noted his distress that the hearing had an adversarial tone from the outset, to which the Bankruptcy Judge essentially admitted that she had a predisposition against Wells Fargo going into the hearing.[13]

During the proceeding, Wells Fargo presented the testimony of: (i) Evan Zwerman, Vice President of Wells Fargo; (ii) Robert Ostrowe, Senior Vice President and Regional Credit Manager for the New York and Philadelphia offices of Wells Fargo, and (iii) Daniel McAuliffe, Esq., counsel to Wells Fargo, whose legal experience was discussed in detail above.  Each of these witnesses presented testimony corroborating the statements made in their respective affidavits (attached as Exhibits to the Response Brief) and established the Wells Fargo Representatives' authority with respect to the Mediation.

Notably, due to Mr. Zwerman's daily interactions with the officers and other employees of the Debtor prior to the commencement of the Case, and the daily revolving loans and advances made to the Debtor both before the after the Petition date, Mr. Zwerman possessed more knowledge and familiarity regarding the Debtor's account than any other officer at Wells Fargo (Zwerman Affidavit ¶ 3; Ostrowe Affidavit ¶ 4).  Thus, in choosing a representative to

---

[13]  *See* 12/31 Transcript 11:1-13 (noting that the Bankruptcy Judge had "some ideas about Wells Fargo's attitude in this case" based upon "history" other than what occurred or allegedly occurred during the Mediation).

attend the Mediation, Wells Fargo selected Mr. Zwerman not only because he had the requisite authority to settle the matter at hand, but also because he was the most familiar with the Debtor's account and accordingly would be best-suited to address any and all issues that were raised at the Mediation. (12/31 Transcript 33:13-14; 47:4-7; 47:16-17; 49:2; 49:12-16).

While describing the authority of Mr. Zwerman with respect to the Mediation, Mr. Ostrowe, a senior officer to Mr. Zwerman, explained that, while neither he, nor any officer at Wells Fargo has "unlimited authority to dispose of any matter for any amount", (Ostrowe Affidavit ¶ 5; 12/31 Transcript 50:9-13), Mr. Zwerman had authority to settle for the amounts at issue in the instant Case.  (12/31 Transcript 47:4-17).

During Mr. McAuliffe's testimony, he testified that he entered the Mediation willing and expecting to discuss with the Mediator and the Mediation Parties, Wells Fargo's position on the law and liability "in light of what was presented during the Mediation."  (12/31 Transcript 66:6-10).  Additionally, he expressed the troubling view that his legal and factual points were not given consideration by the Mediator and/or dismissed as "technicalities" (12/31 Transcript 58:15-18; 59:12-18; 66:17-22).  It was this failure to consider Wells Fargo's legal position, even in light of the documentary evidence provided, that prompted Mr. McAuliffe to believe the Mediator was not acting as a "neutral" during the Mediation.  (McAuliffe Affidavit ¶ 6).

The Mediator then testified as to the allegations contained in the Mediator's Statement and described how the Wells Fargo Representatives at some point in the Mediation made an offer of settlement.  (12/31 Transcript 91:14-25).  The Mediator also testified that the pre-Mediation conduct, standing alone, could not in and of itself, create a sufficient basis to allege bad faith.  (12/31 Transcript 105:11-16).  In many areas, the Mediator's Report and the testimony of the Mediator contradicted documentary evidence and/or other testimony.    What the

Mediator's Report describes as Mr. McAuliffe's "intransigence" was merely Mr. McAuliffe's refusal to accept the Mediator's repeated misstatement that Wells Fargo "swept" the account. In addition to the Mediator's erroneous belief regarding the "sweep", the Mediator claimed that Mr. McAuliffe "rejected any attempt to link the $35,000 advance and an increase in the [Boreal] interest rate." (12/31 Transcript 80:18-23). This issue, however, was never argued by Wells Fargo. In fact, Wells Fargo plainly stated in its Confidential Statement to the Mediator that the interest rate was to be increased, and intended to partially reimburse Wells Fargo. Notwithstanding this partial reimbursement, Wells Fargo is still in a significant loss position with its loan to the Debtor. Mr. McAuliffe attempted to set forth Wells Fargo's additional defenses to liability as discussed further in the Confidential Statement to the Mediator (e.g., expiration of cash collateral use under order, Wells Fargo's super-priority status), which arguments were described as "technicalities" by the Mediator.

Despite the inconsistent assertions by the Mediator and certain uncontroverted testimony regarding the authority of the Wells Fargo Representatives, the Bankruptcy Court issued the Order Appealed From, excoriating the Appellants for "dilatory and obstructive behavior" in the Mediation by intentionally failing to comply in good faith with the Mediation Order. Appellants appeal the Order resulting from the Bankruptcy Court's *sua sponte* contempt motion against them and for the sanctions charged to them for their purported lack of good faith.

## VI.    ARGUMENT

**1. Whether the Bankruptcy Court applied an erroneous standard in holding the Appellants in contempt of the Mediation Order by failing to participate at the Mediation in good faith.**

The Bankruptcy Court applied an incorrect legal standard in issuing its 12/3 Order to Show Cause, its Opinion and the Order Appealed From. There is no dispute as to the

Bankruptcy Court's inherent power to enforce its orders by the imposition of sanctions for acts of civil contempt. *In re Chief Executive Officers Clubs, Inc.* 359 B.R. 527, 533-34 (Bankr. S.D.N.Y. 2007).  The Bankruptcy Court applied an erroneous standard in rendering its holdings:

> …you have determined ahead of time by yourselves that there's no liability. You have not gone through a good faith process of mediation when you do that.

(12/31 Transcript 20:25, 21:1-2).  There is nothing improper in having made a legal assessment of no liability prior to appearing at the mediation, just as there is nothing improper in believing that your legal position is weak.  The proper standard for good faith participation in a mediation includes: (a) delivering a pre-mediation statement to the mediator, if required; and (b) appearing at the mediation with a responsible person possessing full settlement authority.  *See United States Bankruptcy Court for the Southern District of New York Amended General Order for the Adoption of Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary Proceedings* dated January 17, 1995, as amended October 20, 1999 (as amended, the "Standing Mediation Order") at § 3.2.  Wells Fargo complied with each of these standards.  The fact that nothing was presented to dissuade Wells Fargo from its original assessment that should a proper action be brought against it to recover the amounts sought by the other Mediation Parties that it would not be held to be liable, is not a basis for bad faith participation.  Wells Fargo fully complied with the Bankruptcy Court's orders and did not fail to participate in good faith.

### a. Standard for Civil Contempt

A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a

reasonable manner to comply.  *See King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995); *Monsanto Co. v. Haskel Trading, Inc.,* 13 F. Supp.2d 349, 363 (E.D.N.Y. 1998).

"Clear and unambiguous" means that the clarity of the order must be such that it enables the party 'to ascertain from the four corners of the order precisely what acts are forbidden.' *Monsanto Co.,* 13 F. Supp.2d at 36; *citing New York State Nat. Org. for Women v. Terry,* 886 F.2d 1339, 1351-52 (2d Cir. 1989) (finding that the order could serve as the foundation for a contempt citation because it was sufficiently specific and clear as to what acts were proscribed to enable defendants to ascertain precisely what they could and could not do).

"In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 250 (2d Cir. 2002); *see also Perez v. Danbury Hospital,* 347 F.3d 419, 423-24 (2d Cir. 2003) (stating evidence of noncompliance with the order must be clear and convincing).

Any doubts whether the requirements have been met in a particular case must be resolved in favor of the party accused of the civil contempt.  *In re Chief Executive Officers Clubs, Inc.* 359 B.R. at 355 (referencing 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 37.51 (3d ed. 2006)); *Badgley v. Santacroce,* 800 F.2d 33, 36 (2d Cir. 1986), *cert. den.,* 479 U.S. 1067 (1987) (stating because compliance with a court's directive is the goal, an order of civil contempt is appropriate "only when it appears that obedience is within the power of the party being coerced by the order").

Here, the terms of the Mediation Order are clear and unambiguous providing that the Mediation Parties shall attend the Mediation "to attempt to resolve disputes by and between the Mediation Parties relative to the section 363 sale held on March 27th, 2009, in the above-

captioned Chapter 11 Case and the sequelae flowing therefrom, ***including but not limited to the payment of wages for the period March 30, 2009 to April 3, 2009.***"

Among the other terms of the Mediation Order was that the Mediation Parties were required to "furnish the Mediator with copies of such documents and such confidential statement of [its] position as the Mediator may request" and that the Mediation would be "conducted in accordance with the United States Bankruptcy Court of the Southern District of New York Amended General Order for the Adoption of Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary proceedings dated January 17, 1995, as amended October 20, 1999."

Wells Fargo has complied with the terms of the Mediation Order by: (i) submitting its Confidential Statement to the Mediator, (ii) attending the Mediation in good faith and (iii) acting in accordance with the Bankruptcy Court's General Order, and (iv) attending the Mediation ready and willing to discuss all issues presented by the Mediation Parties.

### b. Wells Fargo's No Liability Assessment

Wells Fargo prepared for the Mediation by reviewing the terms of the various cash collateral orders entered into between the Debtor and Wells Fargo, and particularly the Second Amend Interim Order, which governed the advances and charges made during the time period most relevant to the Mediation (March 27 Hearing through April 6, 2009).  In addition, Wells Fargo and its counsel reviewed various pleadings, including the Sale Motion, Wage Motion, Mediation Order and had extensive discussions whereby Wells Fargo and its counsel assessed and analyzed its risks with respect to the facts of the Case.   Based upon this preparation, Wells Fargo came to the Mediation ready to consider any and all claims presented by the Mediation Parties.  (Response Brief at page 4; Zwerman Affidavit ¶ 6; McAuliffe Affidavit ¶ 8; 12/31

Transcript 56:10-25, 57:1-6).

Contrary to the Bankruptcy Court's conclusion, the Appellants did not make a predetermination that they were not liable before entering the Mediation (Wurst Affidavit ¶ 17), but merely established their legal position, which they would advocate and present at the Mediation. Wells Fargo entered the Mediation confident in its legal position and its supporting documentation. While confident, the Appellants were not entrenched in their position, and entered the Mediation willing to accept and consider any statements made by the Mediator or one of the Mediation Parties that presented a logical and legitimate claim as to how it might be held liable for any of the five enumerated claims presented by the Debtor's counsel. (Wurst Affidavit ¶ 23, 25; 12/31 Transcript 56:24-25, 57:1-6).

Neither the Mediation Parties nor the Mediator presented the Appellants with an explanation to support their claim that Wells Fargo "emptied" the Debtor's already-deficient cash collateral account. (12/31 Transcript 58:9-25, 59:1-18). In discussing these issues, the Mediator refused to acknowledge the integral fact that the Debtor did not have the funds to make the Utility Payment and although Wells Fargo "charged" the amount it paid to the Debtor's already deficient loan account, that "charge" merely increased the deficiency. Apparently without giving any consideration to Wells Fargo's legal argument and without presenting Wells Fargo with any contrary legal explanation, the Mediator sought to coax Wells Fargo into paying the entire amount demanded by the other Mediation Parties. (12/31 Transcript 78:14-25, 79:1-13, 84:4-15). Based upon the extreme amount of time the Mediator spent with Wells Fargo, it did not appear that he devoted any time to similarly "coax" the other Mediation Parties. The Appellants maintained their position that they were not legally liable, and although the Mediator urged otherwise, the Appellants held firm on their position - something that was well within their

legal rights.  *See Bulkmatic Transp. Co. Inc. v. Pappas,* 2002 WL 975625, at *2 (S.D.N.Y. May

9, 2002) (noting that a party is not required to change its settlement parameters by reason of a

court order to attend a settlement conference); *Dawson v. United States*, 68 F.3d 886, 890-93

(5th Cir. 1995) (discussing how parties to a mediation must not be forced to settle or offer a

settlement).  Based upon this failure to settle (by paying the entire amount demanded by the

other Mediation Parties) the Mediator raised allegations of mediating in bad faith, resulting in the

Bankruptcy Court issuing its 12/3 Order to Show Cause.

### c.  Incorrect Risk Analysis Standard

The Bankruptcy Court applied an erroneous standard that was factually and literally

impossible to comply with, and it was only as a result of the failure to meet this standard that the

Bankruptcy Court held the Appellants in contempt.  This standard is what the Bankruptcy Court

refers to as a "risk analysis"[14] and according to the Bankruptcy Court is a fundamental

requirement within all mediations.  The Appellants' review of pertinent case law and treatises

reveals no guidance as to how this standard shall be applied, and accordingly take the position

that the Bankruptcy Court incorrectly considered and applied such standard in issuing its Order

and Opinion.

> Wells Fargo's counsel insisted on being dissuaded of the
> supremacy of its legal obligations, in lieu of participating in
> discussion and risk analysis.

(Opinion at 23 (emphasis added)).  Appellants submit that this statement is contradictory to itself

inasmuch as by "insist[ing] on . . . the supremacy of its legal obligations" they participated by

---

[14]  In addition, it is Appellants' view that neither the Bankruptcy Court nor the Mediator considered "risk analysis" to infer a balancing of legal risks, but, instead, actually considered "cost analysis".   In other words, where neither the Mediator nor the other Mediation Parties advocated a contrary legal argument that might indicate a "legal risk", they did emphasize the relatively small dollar amount at issue – candidly, an amount for less than the costs of these proceedings.  Risk analysis and cost analysis are issues to be balanced by a mediation party to justify whether to settle.  They are not "standards" to be imposed by either a mediator or a court.  American jurisprudence guarantees a litigant due process with an opportunity to be heard.  It does not require a party – whether right or wrong on the law – to settle.

"insist[ing] on being dissuaded."   It should be presumed that each mediation party walks in believing in the strength of its position.  Challenging the other side to dissuade it of that position is integral to the mediation.  If the party is dissuaded then it will be more willing to compromise. If the party is not dissuaded then it is less likely to compromise.  It is noteworthy that none of the Mediation Parties was dissuaded from its position during the Mediation but the Mediator and the Bankruptcy Court only found Wells Fargo not to be acting in good faith.

Wells Fargo balanced the legal arguments presented and did not believe a credible claim could be made against it, yet was willing to entertain any position raised at the Mediation.  At the Mediation, Wells Fargo was not presented with facts to dissuade it from its original position. (12/31 Transcript 34:10-12).  The Appellants did not enter the Mediation entrenched in its view, rather neither the Mediator nor the other Mediation Parties were able to dissuade Wells Fargo from its view that it was not culpable.  (12/31 Transcript 34:15:18).  Nor were the other Mediation Parties dissuaded from their original positions.  They, however, were not sanctioned in any manner.

The Mediator appears to have had a misperception of "risk analysis" as indicated by his testimony that he was puzzled by Wells Fargo's position which would result in it being forced to incur additional legal fees.  (12/31 Transcript 77:17-18 ("why would you spend over $50,000 [in] legal fees to defend such a position?")).  The Bankruptcy Court appeared to adopt this erroneous "risk analysis".  (12/31 Transcript 77:19-24).

It appears that both the Mediator and the Bankruptcy Court confused "risk analysis" with "cost analysis," each of which is a valid reason to compromise.  In "risk analysis" one must

consider the strength of one's legal argument.   In cost analysis, one balances the cost of achieving the legal result against paying a settlement amount.[15]

Mr. McAuliffe specifically testified that he did not have an intransigent view about risk and that after the Mediator presented a hypothetical situation where risk was involved, Mr. McAuliffe discussed the "risk analysis" with Mr. Zwerman.  (12/31 Transcript 60:11-25; 61:1-10; 66:6-10).   Nonetheless, the Appellants were not swayed by the arguments presented and continued to hold  their position that there was not a basis for liability.

The Court applied a standard that a party should leave its legal analysis at the doorstep of the mediation and is not entitled to advocate its legal position:

> MR. COOPER: When we come to a mediation, Your Honor, believing that the law is on our side, and we have always taken the position and took the position –
>
> THE COURT: That is not okay in a mediation.

(12/31 Transcript 21:3-6).   We submit that the Bankruptcy Court has applied an erroneous standard in reaching its findings.   To hold this as a standard would compromise the entire litigation process (including mediation).   A party is expected to advocate its position provided that position is not for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.   In addition, the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending,

---

[15]  Paying "nuisance value" is not mandated in mediation.  It has been widely held that a party is within its rights to adopt a "no pay" position at and that such a position does not evidence a lack of good faith.  *See G. Heileman Brewing Co. Inc. v. Joseph Oat Corp.,* 871 F.2d 648, 653 (7th Cir. 1989) (*en banc*) (suggesting sanctions cannot be based on the refusal to make a monetary offer); *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114 (2d Cir. 1988) (arguing sanctions would be inappropriate where the defendant failed to make what the court considered a "bonafide offer"); *Kothe v. Smith,* 771 F.2d 667 (2d Cir. 1985) (fine reversed where the defendant failed to offer the amount recommended by the court); *Gray v. Eggert,* 248 Wis. 2d 99 (Ct. App. 2001) (concluding that the trial court had no factual basis for reaching a conclusion that the defendant had not mediated in good faith from the fact that defendant's settlement offer was one hundred dollars).

modifying, or reversing existing law or for establishing new law.  *See* Fed. R. Civ. Pro. Rule 11(b).

Instead, "risk analysis" is intended to identify critical risks to a party's legal position and to make a determination based on that assessment.  (Opinion at 13, quoting *Younger*).  <u>A party that is not persuaded by either the mediator's or its adversaries' arguments should not be pressured to settle out of fear that it will be found to have not participated in good faith</u>.

Throughout the 12/31 Hearing, the Bankruptcy Court referenced the Appellants' failure to engage in a risk analysis.  The Bankruptcy Court claimed that that "[Wells Fargo] did not go through their own risk analysis."  (12/31 Transcript 25:8-9).  Further in describing Mr. Zwerman's discussion of the risk analysis engaged in, the Bankruptcy Court said "it's a risk analysis and this individual did not have the ability or the authority to go through all those links." (12/31 Transcript 39:15-21).

However, in making this determination the Bankruptcy Court failed to consider that Wells Fargo did indeed engage in this risk analysis, and after weighing the "risks" remained unpersuaded by the arguments presented by the Mediator and the other Mediation Parties. (12/31 Transcript 40:13-25).  The Court incorrectly concluded, "Wells Fargo entered the Mediation to assert the supremacy of its legal argument, and not to contemplate risk analysis." (Opinion at 24).

The Bankruptcy Court recognized that Wells Fargo was confident in its legal position, however it erred in its assumption that Wells Fargo failed to engage in risk analysis.  As Mr. Zwerman testified, no persuasive arguments were presented at the Mediation to change Wells Fargo's position.  (12/31 Transcript 40:13-25).

Moreover, Mr. Zwerman testified that he and Mr. McAuliffe discussed and considered the legal and factual positions raised by the Mediator, both in front of the Mediator and outside of his presence. (12/31 Transcript 40:3-25; 42:12-25; 43:1-6).   In particular, Wells Fargo evaluated the merits of the claims to be mediated, what the risks were to Wells Fargo relative to what was being mediated and after discussions with his counsel determined that Wells Fargo was not liable.  (12/31 Transcript 34:2-6; 15-18).   Despite this uncontroverted testimony to the contrary, the Bankruptcy Court held, without any support in the record, that Wells Fargo did not "go through the process of mediation."  (12/31 Transcript 158:7).

The Bankruptcy Court's holding that Wells Fargo failed to participate in good faith is clearly erroneous and should be reversed.

### 2.   Whether the Bankruptcy Court erred in determining that Wells Fargo sent a party to the Mediation that did not have full settlement authority.

"The Court has not been presented with sufficient evidence to support a finding that Zwerman and McAuliffe had the requisite authority to settle the matter." (Opinion at 21).  This statement was made notwithstanding the unrebutted testimony of two senior officers of Wells Fargo that Mr. Zwerman had authority to settle for the full amount of the claim.  Further, there was no testimony or other allegation by anyone present at the Mediation that Wells Fargo lacked full settlement authority.  Accordingly, its is submitted that the Bankruptcy Court's finding is clearly erroneous.

The presence of a corporate representative is the cornerstone of good faith participation in mediation. *Nick v. Morgan's Foods, Inc.*, 99 F. Supp.2d 1056, 1062 (E.D. Mo. 2000), *aff'd*, 270 F.3d 590 (8th Cir. 2001).  For mediation to work, the corporate representative must have the authority and discretion to change their opinion in light of the statements and arguments made by the neutral and opposing party.  *Id.*  Wells Fargo sent Mr. Zwerman, a Vice President of Wells

Fargo and its corporate officer who was most familiar with the Case, to attend the Mediation. Both prior to and following the bankruptcy filing, Mr. Zwerman served as the Relationship Manager for the Debtor's loan and oversaw the daily management of the loan.   (Zwerman Affidavit ¶ 2).   He was responsible for communicating with the officers and employees of the Debtor, reviewing its borrowing availability and, when appropriate, effecting revolving loans and advances to or for the benefit of the Debtor.   Moreover, in relation to the issues discussed at the Mediation, he had attended the prior hearings in the Case and was fully aware of the Utility Payment made by Wells Fargo.   In addition, he was fully familiar with the terms of the Second Amended Interim Order, which expired on April 6, 2009 – prior to any request of Wells Fargo to make an advance to cover the Wage Claim.   That request, made at 6:59 p.m. on April 7, 2009 by Vivian Faliski, a former employee of the Debtor's who was then employed by Boreal, was denied because the terms of the Second Amended Interim Order had expired and since that denial, no further request was made.

During the 12/31 Hearing, Wells Fargo stated its position that it had fully analyzed the issues and sent representatives with full authority to settle the matter at hand.   (12/31 Transcript 23:13-16).   Moreover, Wells Fargo explained its position that Mr. Zwerman possessed full authority to settle "anything up to the amount of the claim" (12/31 Transcript 23:19-21), and being fully familiar with the parties, loan documents and prior proceedings, was best suited to make a determination on behalf of Wells Fargo.   Nonetheless, in rendering its Opinion, the Bankruptcy Court rejected the unrebutted testimony that established Mr. Zwerman's authority and held that he lacked authority.   (Opinion at 28-29 ("Wells Fargo failed to comply with the Mediation Order by sending an agent whose authority was generally limited by 'borrowing base formulas,' with settlement authority up to a predetermined amount.")).

The Bankruptcy Court appears to have required a representative to the Mediation to have the "authority to enter into creative solutions" (Opinion at 29 (requiring a mediation representative to have "authority to enter into creative solutions")) and that even one with authority to settle for an amount exceeding the amount in controversy is insufficient.

The Bankruptcy Court seemingly required the Wells Fargo Representatives to possess authority that no one at Wells Fargo (or any other bank, for that matter) had. The Bankruptcy Court determined that the Appellants did not "send anyone with enough rank, on either one of them[,]" and despite testimony to the contrary, the Bankruptcy Court held that the Appellants sent "two novice people . . . where they're [sic] needed to be assessments." (12/31 Transcript 161:14-23). These "assessments" apparently require that a party to a mediation have the authority to "absolutely mediate anything that might come up" (12/31 Transcript 160:2-5, 16-24 ("It's a matter of being able to go in and assess anything.")); yet even the Mediator explained "the amount in controversy was something less than $20,000." (Mediator's Report at page 5).

The Appellants satisfied this requirement by sending Mr. Zwerman who had the authority to settle the matter for an amount up to $35,000. (12/31 Transcript 49:7-8). However, according to the Bankruptcy Court, this demonstrated inadequate settlement authority at hand. The Bankruptcy Court demanded that the parties must be capable of settling any and all matters that *may arise* through the Mediation. Notwithstanding, Wells Fargo sent a representative with authority to settle up to the full amount disclosed to it, which amount was sufficient to meet the requirement of the Mediation Guidelines that a representative with full settlement authority attend.

The standard applied by the Bankruptcy Judge that the attendee have authority to enter into "creative solutions" for any issue that could possible arise is an unattainable standard, and

clear error.

While the Bankruptcy Court relied upon the Mediator's Report in finding the Appellants lacked settlement authority, the Mediator's Report never claimed that Wells Fargo lacked settlement authority, but instead, merely referred to the Wells Fargo Representatives as "junior." It is puzzling as to how the Mediator's classification of the Wells Fargo Representatives as "junior" led the Bankruptcy Court to determine the Wells Fargo Representatives lacked settlement authority.[16]   Assuming, *arguendo*, the ten-year asset based lending officer (Zwerman Affidavit ¶ 2; 12/31 Transcript 31:21-23), was "junior", he certainly did not lack authority.   In addition, it is submitted that an attorney who has clerked for a bankruptcy judge and has practiced law, concentrating primarily in the lending and bankruptcy field, for over ten years, including mediation experience (12/31 Transcript 52:13-21; Wurst Affidavit ¶14), is not a "junior".

The Bankruptcy Court's finding that Zwerman and McAuliffe lacked "the requisite authority to settle the matter" is clearly erroneous.

### 3.   Whether the Bankruptcy Court erred in finding that the Appellants violated the terms of the SDNY Standing Mediation Order and the Mediation Order.

In its Mediation Order, the Bankruptcy Court directed the Mediation Parties to participate in the Mediation to be conducted in accordance with the Standing Mediation Order.[17]   The Standing Mediation Order governs, among other things, the parties' conduct during the mediation.   It requires that parties to a mediation should have "settlement authority" and

---

[16]   At some point during the Mediation and at the insistence of the Mediator ((12/31 Transcript 87:12-25; 88:1-4), Mr. McAuliffe made a phone call to his office (McAuliffe Affidavit ¶ 12, fn. 1).   Without any support from the record the Bankruptcy Court incorrectly held that phone call represented that "a pivotal decision was made by an absent person, who did not have the benefit of observing the mediation and interacting with the other parties and the mediator."  (Opinion at 29).

[17]   Subsequent to the date of the Mediation, the Standing Mediation Order has been amended, restated, and superseded by General Order M-390.

provides that the "willful failure" to participate in good faith in the mediation process "may result in the imposition of sanctions by the court." Standing Mediation Order at § 3.2.

While parties to a mediation are required to have "settlement authority" and must participate in the mediation in good faith, failure to reach a settlement does not demonstrate bad faith or lack of settlement authority, for the ultimate authority in a case belongs to the parties. *Negron v. Woodhull Hosp.,* 173 Fed. Appx. 77 (2d Cir. 2006) (recognizing a party's right to adopt a no-pay position); *Bulkmatic Transp. Co. v. Pappas,* 2002 WL 975625, at *2 (S.D.N.Y. May 9, 2002) (noting that a party is not required to change its settlement parameters by reason of a court order to attend a settlement conference); *Dawson v. United States,* 68 F.3d 886, 890-93 (5th Cir. 1995) (discussing how parties to a mediation must not be forced to settle or offer a settlement). *See* Robert A. Baruch Bush, *Staying in Orbit, or Breaking Free: The Relationship of Mediation to the Courts Over Four Decades*, 84 N.D. L. REV. 705, 718 (2008) (stating "[t]he ultimate authority in mediation belongs to the parties . . ."); Douglas A. Henderson, *Mediation Success: An Empirical Analysis*, 11 OHIO ST. J. ON DISP. RESOL. 105, 127 (1996) (focusing on informal process where parties make ultimate decision, only to be assisted by third party); *see also* BLACK'S LAW DICTIONARY 996 (8th ed. 2004) (defining nonbinding dispute resolution as parties reaching "a mutually agreeable solution").

At the December 1, 2009 Conference, the Court advised that the determination of whether there was a lack of good faith in the mediation process would be based upon "whether a person with full settlement authority appeared" and whether "they were recalcitrant in putting [the Mediation] together."[18] (12/1 Transcript 5:11-13). The Bankruptcy Court ultimately found Wells Fargo to be in contempt and subject to sanctions because "attendance at a mediation

---

[18] "12/1 Transcript ____" refers to the page of the Transcript of Hearing on 12/1/09 designated by Appellants as an item to be included in the record on appeal.

without participation in discussion and risk analysis that are fundamental practices in mediation constitutes failure to participate in good faith."  (Opinion at 22).

While the Standing Mediation Order does not provide a definition, Black's Law Dictionary defines "good faith" as follows:

> Good faith is an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage, and an individual's personal good faith is a concept of his own mind and inner spirit and, therefore, may not conclusively be determined by his protestations alone . . . In common usage this term is ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation.

A number of commentators have noted the particular difficulties in defining "good faith" in the context of mediation.  *See, e.g.,* John Lande, *Using Dispute System Design Methods to Promote Good-Faith Participation in Court-Connected Mediation Programs*, 50 UCLA L. REV. 69, 86 (2002) ("The definition of good faith in mediation is one of the most controversial issues about good-faith requirements."); *See also* Holly A. Streeter-Schaefer, *A Look at Court Mandated Civil Mediation*, 49 DRAKE L. REV. 367, 372 (2001).

While the Appellants are unaware of any reported cases that have enumerated the requirements for participating in mediation in good faith, allegations of a lack of good faith in reported cases have generally fallen into one of five categories:  (i) failure to attend; (ii) failure of an organizational party to send a representative with sufficient settlement authority; (iii) inadequate preparation for the mediation, including the failure to have submitted a pre-mediation statement; (iv) insufficient efforts to resolve the matter, including the failure to make a suitable offer or any offer at all, making inconsistent legal arguments, not providing requested documents, or unilateral withdrawal from the mediation; and (v) miscellaneous allegations,

including failure to sign a mediated agreement or engaging in unspecified bad-faith behavior. *Accord* Lande, *supra* at 83.

The Standing Mediation Order in the instant matter specifically requires that the representative of each party have "complete authority to negotiate all disputed amounts and issues." Standing Mediation Order at § 3.2.[19] Courts have generally found a lack of good faith only where parties failed to attend or failed to provide pre-mediation statements, while rejecting allegations of bad faith in all other situations. *See* Lande, *supra* at 84-85 (noting the findings in reported cases).[20]

The Bankruptcy Court's Opinion is inconsistent with prior case law and is internally contradictory. The Court recognizes that "a court cannot force litigants to settle an action." (Opinion at 21-22).

A court has authority to press for a settlement between litigating parties only to the extent that "a court can require parties to appear for a settlement conference, and impose sanctions pursuant to Rule 16(f) [of the F.R.C.P.] if a party fails to do so." *Bulkmatic Transport Co., Inc. v. Pappas,* 2002 WL 975625, at *2 (S.D.N.Y. May 9, 2002). *See Mordechai v. St. Luke's-Roosevelt Hospital Center,* 2001 WL 699062, at *2 (S.D.N.Y. June 20, 2001) ("Although a court may not require litigants to settle an action, it is well-established that a court may require parties to appear for a settlement conference"); *Dan River, Inc. v. Crown Crafts, Inc.,* 1999 WL 287327, at *2 (S.D.N.Y. May 7, 1999). By the same token, the Bankruptcy Court cites no case (nor have the Appellants identified any) in which a party, once having arrived at a mediation, has been sanctioned under Rule 16(f) for failing to take a position conducive to the mediation.

---

[19]  In the absence of such a specific requirement by statute or order such as the Standing Mediation Order, cases have been split where allegations of attendance of a representative lacking sufficient settlement authority have been made.

[20]  Our review shows that findings in reported cases since this article remains consistent.

Yet, in this instance, that is what the Bankruptcy Court has attempted to do. Its contempt and sanction determination is not based on any failure by the Appellants to appear at the Mediation. Rather, what the Bankruptcy Court found intolerable was that, at the Mediation, when Wells Fargo failed to accede to the suggestions of the Mediator, who, as a result, claimed Wells Fargo was not acting in good faith.

The Bankruptcy Court relies upon *Fisher v. SmithKline Beecham Corp.*, 2008 WL 4501860 (W.D.N.Y. Sept. 29, 2008), for the principle that a party could be sanctioned under Rule 16(f) for failing to take a position conducive to the mediation. However, *Fisher* involved a case where the court directed the parties were ordered to mediation, and one day before the mediation, the defendant filed a motion for summary judgment. The mediation was scheduled to be held in Buffalo, New York. The plaintiff's attorney traveled from New Orleans, Louisiana. The plaintiffs closed their family business and incurred other inconveniences. *Id.* at *7. When they arrived at the mediation, they were presented with the motion for summary judgment. When no settlement was reached, *plaintiff sought sanctions*. *Id.* at *6 (emphasis added). While the *Fisher* court discussed the defendant's conduct at the mediation in its opinion, it focused its attention on the fact that the defendant filed its motion for summary judgment one day prior to the mediation. The defendant had not advised the plaintiff that it would be filing the motion for summary judgment on the eve of the scheduled mediation. Thus, the court held that the "failure to timely advise plaintiffs of the summary judgment motion Defendant intended to file caused plaintiffs to unnecessarily incur expenses for no good reason" and as a result, sanctions were imposed. *Id.* at *7.

Contrary to *Fisher*, the Bankruptcy Court issued its *sua sponte* 12/3 Order to Show Cause. The "bad faith" in *Fisher* related to the defendant's conduct prior to but not during the

mediation.  Accordingly, the Bankruptcy Court was incorrect in relying upon *Fisher*.

The Second Circuit's decision in *Negron v. Woodhull Hosp.*, 173 Fed. Appx. 77 (2d Cir. 2006), clearly establishes that a party is "free to adopt a 'no pay' position" at a mediation.  The Bankruptcy Court qualifies this holding by calling it *dicta* yet recognizes that the court issued sanctions because the defendant failed to bring a principal party to the mediation.  What the Bankruptcy Court failed to consider is that where a party sends a person with authority to a mediation (as Wells Fargo did), it is within its rights to adopt a no-pay position.

The Bankruptcy Court relies on *Hughes v. The Lillian Goldman Family*, 2000 WL 1228996 at *2 (S.D.N.Y. Aug. 30, 2000), for the proposition that "[e]ven where the case does not settle at the settlement conference, the settlement conference often begins the dialogue that ultimately leads to the settlement."  *Id.*  The Bankruptcy Court, however, failed to note that in *Hughes*, the attorney who attended the settlement conference was unfamiliar with the case and had only received the file the night before the settlement conference.  As a result, he was unable to discuss even the most basic facts giving rise to the case.  *Id.*  In addition, the defendant failed to send a party representative to the settlement conference and it was upon these facts the court issued sanctions.

Contrary to the *Hughes* case, Wells Fargo and its counsel spent considerable time preparing for the Mediation, including drafting its Confidential Statement to the Mediator, having strategy conferences and reviewing pertinent motions and orders.  (12/31 Transcript 32:13-21, 34:4-6, 61:15-25, 62:1).  Mr. McAuliffe had participated as Wells Fargo's counsel since the Petition Date and was thoroughly familiar with all aspects of this case.  Mr. Zwerman was the Vice President who handled the day to day management of the Debtor's loan account and appeared at virtually every hearing at which Wells Fargo appeared.  Thus, this Case is unlike

*Hughes*, inasmuch as the Wells Fargo Representatives possessed adequate settlement authority, were in a position to settle the matter at hand should they have been persuaded by the Mediation Parties, and after failing to be presented with a reasonable position, and weighing all the factors chose not to settle.  It is submitted that such conduct does not rise to the level of bad faith.  The Bankruptcy Court is clearly erroneous in holding it did.

The Bankruptcy Court also chastised Wells Fargo for what it claimed was "dilatory behavior leading up to the [M]ediation" and which demonstrated its failure to reconsider its position at the Mediation.  The Court made this assertion despite the uncontroverted testimony of the Mediator in which he explained that the pre-Mediation conduct, standing alone, could not in and of itself, create a sufficient basis to allege bad faith.  (12/31 Transcript 105:11-16).

The pre-Mediation conduct centered around the scheduling of the Mediation, the issues to be addressed at the Mediation, and identifying the parties that would attend the Mediation.  The Bankruptcy Court improperly characterized these requests by Wells Fargo as undermining the Mediator's authority and demonstrating that "Wells Fargo and its counsel sough to control the [M]ediation."  (Opinion at 30).

Wells Fargo was not recalcitrant in setting up the Mediation.  (Wurst Affidavit ¶ 20-32).  While the Mediator's Report characterizes the Mediation session being "finally agreed to with difficulty" and that Wells Fargo made a "series of unusual demands," the specific communications referred to by the Mediator are the emails attached to the Wurst Affidavit.  The nature of the communications referred to parties' scheduling availability, identification of issues, and assurance that each party would be represented at the Mediation by a person with authority.  A review of the emails substantiates Wells Fargo's position that such communications do not exhibit a lack of good faith, and further demonstrate that the intent behind the emails was to

<u>ensure that Wells Fargo would come to the Mediation fully prepared to discuss any and all issues raised</u>.  (Wurst Affidavit, Exhibit "C", 1-2).

The Appellants are unaware of any court that has found any such similar questioning prior to the mediation session, or any other actions as asserted by the Mediator to have been in bad faith.[21]  The Mediation presented a unique challenge to Wells Fargo inasmuch as it was being directed to attend a mediation where it was being called to pay money, yet no complaint, motion, or other pleading had ever been filed seeking any relief against it.  When Wells Fargo inquired as to the nature of the mediation, it was satisfied with the issues enumerated other than, "And any other issues anyone wants to discuss . . . .",  (Wurst Affidavit, Exhibit "C", 1-2), and continued to inquire about this, so as to enable it to be prepared at the Mediation.  As noted above, so long as a party has attended the mediation with a representative with settlement authority and provided a pre-mediation statement (if required), courts have consistently rejected allegations of bad faith in all other situations.  *See* Lande, *supra* at 84-85.

Despite the unfounded findings of the Bankruptcy Court, Wells Fargo participated in the Mediation in good faith.  It was represented by experienced counsel and a "party representative" with full settlement authority for the issues presented in advance and, as it turned out, actually addressed at the Mediation.  The "pre-mediation" issues were not indications of being "recalcitrant" but, to the contrary, sought to frame the issues to enable Wells Fargo to be prepared to participate in the Mediation.  Even the Mediator acknowledged that a clarification of the issues can make it more efficient if the parties know and understand the issues to be addressed at the mediation (12/31 Transcript 118:5-6).  The "pre-mediation" issues also involved Wells Fargo's understanding that Boreal would not be represented by a person with full authority

---

[21]   In fact, in Wells Fargo's experience, party representatives and the issues to be mediated have generally been disclosed before the parties appear for the mediation.

–something that did, in fact, occur, but without any protestations from the Mediator or the Bankruptcy Court.  The Appellants submit that if any party participated in bad faith, it certainly was not Wells Fargo, and accordingly, any finding by the Bankruptcy Court that the Appellants violated the terms of Standing Mediation Order or the Mediation Order is clearly erroneous.

> **4.   Whether the Bankruptcy Court erred in hearing its own motion to hold the Appellants in contempt for allegedly attending the Mediation in bad faith.**

The Bankruptcy Court erred in presiding over the proceedings responding to its 12/3 Order to Show Cause.  The Mediation Guidelines are silent regarding whether a judge should properly preside over disputes regarding allegations of a lack of good faith in a mediation of a case assigned to her.

Certain other jurisdictions have rules expressly providing that allegations regarding a lack of good faith be directed to a different judge.  For example, E.D.N.Y. Local Bankruptcy Rule 9019(e) provides:

> If a mediation participant willfully fails to participate in good faith in the mediation process, then the mediator shall submit to the Clerk and serve on the mediation participants a report of the failure to participate. The report shall not be electronically filed, shall state on the first page at the top right corner that it is being *submitted to the attention of the Clerk,* and shall state that it is a report of a failure to mediate in good faith *that should not be filed or given to the Judge. The report shall not be sent to the Judge presiding over the matter.* The Clerk shall deliver the report to the Judge designated by the Chief Judge for mediation, who will take appropriate action, including holding a conference or hearing in person or telephone, and who may, in appropriate circumstances, impose sanctions.

The S.D.N.Y. Local Bankruptcy Rules do not contain such an express provision. However, given the problems created and difficulty in presenting and testifying to the issues that the parties experienced in the instant Case, the Appellants submit that this Court be guided by E.D.N.Y. Local Bankruptcy Rule 9019(e).

In her apparent attempts to remain sheltered from the position of the Mediation Parties, the Bankruptcy Judge did hear (and apparently considered) certain of the positions of the Mediation Parties while declining to hear others.  *Compare* 12/31 Transcript 78:14-25, 79:1-25, 80:1-23 (outlining the Mediator's one-sided explanation of the internal discussions and positions presented at the Mediation, particularly noting those taken by Boreal, while failing to mention Wells Fargo's position) *with* 12/31 Transcript 57:7-19 ("I could care less if [Mr. McAuliffe] shared [the thought process regarding risk analysis] with Zwerman"); 59:12-25 (evidencing the Bankruptcy Court stifling Wells Fargo's testimony while it permitted the Mediator to testify to the same issue but from the opposite perspective).  A judge unrelated to the underlying issues would have heard the "risk analysis" engaged in by Wells Fargo, as well as other facts that the Bankruptcy Judge chose to be sheltered from.

Throughout the 12/31 Hearing, witnesses, called by both the Appellants and the Bankruptcy Court were directed to tailor their testimony so as not to disclose "confidential communications" to taint the Bankruptcy Court's impartiality in a potential later ruling on the merits of the matter being mediated.  As clearly demonstrated throughout the 12/31 Hearing, the Bankruptcy Court was constantly addressing the issue that it was not there to hear the merits of the Mediation, yet found itself frequently hearing the very same testimony it sought to prevent.  This could have all been easily avoided if the Bankruptcy Court had referred the matter to another judge.  The result was that the Bankruptcy Court refused to hear Wells Fargo's risk analysis and then erroneously determined that it had not engaged in any.

The Bankruptcy Court was regularly instructing the witnesses: "Please try and stay general.  I don't want to be tainted."  (12/31 Transcript 55:17-18; 59:20-25).  Although such concern was expressed, it was inevitable that statements, and more importantly, settlement

positions, were heard by the Bankruptcy Court.  In doing so, the Bankruptcy Court unnecessarily opened itself up to hearing issues on the merits that "color[ed]" the Bankruptcy Court's impartiality.  (12/31 Transcript 41:1-4).  This obviously had an effect on witness testimony and in some cases precluded the witness from getting into necessary detail.  (12/31 Transcript 63:11-12).

The Bankruptcy Court repeatedly admonished the Mediator not to continue to reveal details that related to the substance of the Mediation.  (12/31 Transcript 85:1, 89:18-20; 99:19-20; 134:11-13).  Moreover, while admonishing the Mediator for talking about the dollar value of the claim (12/31 Transcript 90:1-8; 99:12-20; 100:16-18), the Bankruptcy Court recognized the settlement amounts discussed despite warnings to the Mediator not to reveal the amount.  (12/31 Transcript 100:18-20; *Bernard v. Galen Group, Inc*., 901 F. Supp. 778, 782-84 (S.D.N.Y. 1995) (plaintiffs' attorney sanctioned for disclosing terms of two settlement offers, including specific dollar amounts, made by defendants during mediation process)).  Even the Mediator noted the difficulty in presenting testimony in line with the Bankruptcy Court's restrictions on what testimony could be revealed.  (12/31 Transcript 81:17 ("Yes, it's hard")).[22]

Wells Fargo's unwillingness to pay the amounts demanded by the Mediator was the result of its risk analysis.  The two are inseparable.  It is noteworthy that during the August 25 Hearing,  which Wells Fargo did not attend, the Bankruptcy Court questioned whether Wells Fargo could be responsible for the amounts sought in the Mediation:

> MR. PASCALE: ….. I have filed a letter requesting mediation which would bring Wells Fargo to the table and possibly give us an opportunity to hash it out.

---

[22]   The Appellants would like to bring to this Court's attention the number of times that the Mediator was admonished by the Bankruptcy Court for revealing information relating to the substance of the Mediation, rather than the process.  Wells Fargo submits that this is indicative of the Mediator not acting as a "neutral" during the Mediation and perhaps calls into question the Mediator's creditability, particularly in regard to the Mediator's Report.

> THE COURT: How would it bring Wells Fargo to the table?
>
> MR. PASCALE: Your Honor, if Your Honor was inclined to issue an order directing the parties to mediation to resolve the question that Boreal has raised, which is that certain representations should remain off the record by Mr. Wurst, who was attorney for Wells Fargo at the 363 hearing, as to how the additional point which Boreal apparently paid at the sale would be applied, then we think we could resolve the issue.
>
> THE COURT: Anyone have any opposition to putting in a mediator? I mean we're a week away from September, seems to me -- I don't know how you can get Wells Fargo to the table but I'd be willing to try.

(8/25 Transcript 7:18-25, 8:1-8).

The purpose of the E.D.N.Y. Local Rule is to direct the bad faith hearing away from the judge hearing the main case and ensure that an impartial party, not swayed by the proceedings before it, can make a separate and distinct determination as to the bad faith hearing. Unlike a judge who has heard issues relating to the merits of the case, by directing the bad faith hearing to another judge, a court ensures that a decision will be made free from any prior perceptions that may exist. To allow the same judge to hear both the bad faith hearing and the main case (in the word of the Bankruptcy Court) "colors" the judge and leads to questions concerning that judge's impartiality. By allowing a different judge to hear the bad faith hearing a witness can be candid and frank in its responses during the bad faith hearing instead of being forced to tailor its testimony so as not to disclose critical facts to the Court.

The Bankruptcy Judge should have disqualified herself from the Case. 28 U.S.C.A. § 455(a), (b)(1) recognizes that a judge should disqualify herself where "impartiality might reasonably be questioned" and "where [s]he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *See also* Fed. R. Bankr. P. 5004(a). Here, it is clear that the Bankruptcy Judge had preconceived opinions.

As demonstrated by the comments made at the outset of the 12/31 Hearing, and continuing throughout the hearing, the Bankruptcy Judge clearly manifested a bias and prejudice against the Appellants, derived, in part, from the allegations contained in the Mediator's Statement.

> MR. COOPER:  Mr. Wurst, who, by the way regrets that he couldn't be here and he is –
>
> THE COURT: Don't get me started.
>
> MR. COOPER: -- out of the country.  Pardon me?
>
> THE COURT: Don't get me started.
>
> MR. COOPER: I won't get you started, but he asked that I express his regrets.
>
> THE COURT: They're not well received.
>
> MR. COOPER: Well, they are kindly and well delivered, Your Honor.

(12/31 Transcript 7:14-24).  A lengthy dialogue ensued whereby the Bankruptcy Judge appeared to have already made her determination:

> THE COURT:  You're here because you didn't go into a mediation with the mediation -- for the purposes of mediation. You went into a mediation for the purposes of what would seemingly seem like arbitration.
>
> MR. COOPER: Have you made up your mind, or may I continue to discuss this?

(12/31 Transcript 13:5-11).

There exists authority that disqualification may be based solely upon a bankruptcy judge's apparent animosity towards an attorney for a party appearing before a judge, if it is of such an intensity to warrant a reasonable belief that the judge might not be able to consider impartially the arguments of the attorney, thus resulting in unfairness to the party. *In re Beard*,

811 F.2d 818 (4th Cir. 1987); *In re Forty-Eight Insulations, Inc.*, 84 B.R. 129 (Bankr. N.D. Ill. 1988); *In re Muller*, 851 F.2d 916 (7th Cir. 1988), *cert. den. sub. nom., Rogers v. First Nat. Bank of Peoria*, 490 U.S. 1007 (1989).   Here, the Bankruptcy Judge's apparent animosity and ill-feelings towards Wells Fargo's counsel clearly prejudiced Wells Fargo.

Whether a bankruptcy judge's impartiality might reasonably be questioned depends on whether an objective observer, fully informed of the relevant facts, would entertain a reasonable doubt regarding the judge's impartiality.   *In re Chandler's Cove Inn, Ltd.*, 74 B.R. 772 (Bankr. E.D.N.Y. 1987).   Clearly, the 12/31 Transcript and the Opinion are replete with evidence of the Bankruptcy Judge's lack of impartiality.   The Bankruptcy Judge's conduct prior to the 12/31 Hearing is further indicative that she should have recused herself.   This includes the issuance of the Bankruptcy Court's *sua sponte* 12/3 Order to Show Cause, her failure to grant the Adjournment of the hearing that the Bankruptcy Court scheduled for New Years' Eve, as requested by each of the Mediation Parties, and her issuance of the Clarified Amended Order to Show Cause immediately following the filing of the Response Brief, each of which demonstrate a prejudice against the Appellants.

The Bankruptcy Judge's questions and comments during the 12/31 Hearing further display the lack of impartiality.   The Bankruptcy Judge characterized the claims made in the Response Brief as "disconcerting", "ingenuous and un-incredible", and the factual statements therein as having been set forth "inartfully and not very nice."  (12/21 Transcript 4:23-24, 5:13). Mr. Cooper recognized that "there was an atmosphere created that [he] would like to try to cut through" (12/31 Transcript 5:18-19), but unfortunately the Bankruptcy Judge refused to be swayed from her preconceived biases.

Additionally, in regards to the Appellants' inquiry into a clarification of the issues to be mediated, the Bankruptcy Judge responded, "That's disingenuous.  That is absolutely totally disingenuous."  (12/31 Transcript 10:2-3).  Comments such as these, paired with the Bankruptcy Judge's pointed questions and selective consideration of the positions of the Mediation Parties clearly demonstrate the prejudicial nature, tone and bias of the Bankruptcy Judge. The Bankruptcy Judge's bias as reflected in the 12/31 Transcript as well as in her Opinion demand that this Court reverse the Order Appealed From.

## CONCLUSION

By reason of the foregoing, the Order and Opinion, entered on February 5, 2010, and issued by Hon. Cecelia G. Morris of the United States Bankruptcy Court for the Southern District of New York, in Case No. 08-37739 should be reversed in its entirety.

Dated: Uniondale, New York
       April 23, 2010

RUSKIN MOSCOU FALTISCHEK, P.C.
Attorneys for Wells Fargo Bank, N.A.

By: _____
       Jeffrey A. Wurst, Esq.
       Daniel L. McAuliffe, Esq.
       East Tower, 15th Floor
       1425 RXR Plaza
       Uniondale, New York 11556
       516-663-6600