UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                               :

IN RE: A.T. REYNOLDS & SONS, INC.,
*d/b/a* LEISURE TIME SPRING WATER,   :

           Debtor.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/18/11

10 Civ. 2917 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

        Appellants Wells Fargo Bank, N.A. ("Wells Fargo") and Ruskin Moscou

Faltischek, P.C. ("Ruskin") appeal from an order of the United States Bankruptcy Court,

Southern District of New York (Morris, J.) dated February 5, 2010, sanctioning Wells Fargo and

Ruskin for failure to comply with a mediation order and holding them in contempt. As this

appeal demonstrates, the specter of sanctions and contempt spawns ancillary litigation that often

eclipses the issues at the heart of the underlying proceeding. For the following reasons, the

Bankruptcy Court's order is reversed.

BACKGROUND

I. <u>Bankruptcy Proceedings</u>

        This dispute arises out of the Chapter 11 bankruptcy of A.T. Reynolds & Sons,

Inc. ("A.T. Reynolds") in 2008. During the bankruptcy proceedings, A.T. Reynolds and Wells

Fargo jointly stipulated to two interim orders, under which, <u>inter alia</u>, Wells Fargo provided A.T.

Reynolds with a cash collateral account to use in conjunction with the sale of A.T. Reynolds

assets to Boreal Water Collection, Inc. ("Boreal"). At the sale hearing, New York State Electric

and Gas Corporation ("NYSEG") sought payment of $35,256.23 for unpaid utility bills (the

"Utility Payment"). (Hr'g Tr. dated March 27, 2009 ("3/27 Tr.") 37-38.) After negotiations,

1

Wells Fargo agreed to make the Utility Payment, and Boreal Water Collection, Inc. ("Boreal"),

the prospective buyer of A.T. Reynolds assets, agreed to a small increase in the interest rate in its

payments to Wells Fargo. (3/27 Tr. 67-68.) Boreal finalized the purchase of A.T. Reynolds on

April 3, 2009. (Docket No. 175.)

On July 8, 2009, Boreal brought a claim against A.T. Reynolds for unpaid wages

(the "Wage Claim"). (Docket No. 103.) Boreal also contended that rather than paying the

Utility Payment out-of-pocket, Wells Fargo "utilized the monies in the [A.T. Reynolds] cash

collateral account" (Docket No. 103 ¶ 7) that could have been used to pay the Wage Claim.

(Hr'g Tr. dated Aug. 25, 2009 ("8/25 Tr.") 8.) The Bankruptcy Court ordered that the issue be

mediated. (8/25 Tr. 10; Docket No. 224.)

The Bankruptcy Court's Mediation Order incorporated General Order M-390 of

the United States Bankruptcy Court, Southern District of New York, which provides in relevant

part:

> 3.2. **Mediation Conference**. A representative of each party shall
> attend the mediation conference, and must have complete authority
> to negotiate all disputed amounts and issues. The mediator shall
> control all procedural aspects of the mediation. The mediator shall
> also have the discretion to require that the party representative or a
> non-attorney principal of the party with settlement authority be
> present at any conference. . . . The mediator shall report any
> willful failure to attend or to participate in good faith in the
> mediation process of conference. Such failure may result in the
> imposition of sanctions by the court.

In re Adoption of Procedures Governing Mediation, General Order M-390 Amending and

Reinstating M-143 and M-211 (Bankr. S.D.N.Y. Dec. 1, 2009) (emphasis added).

2

II. Pre-Mediation Conduct

Robert Goldman was chosen as the mediator ("Mediator") on September 24, 2009

(Docket No. 227), and Wells Fargo attempted to discern from him the topics of discussion at the

mediation. In response, counsel for A.T. Reynolds suggested the following:

> 1. Whether Wells Fargo represented to the Court at the . . . sale of
> the debtor's business that the utility bill would be paid by
> Wells;
> 2. Whether there was any agreement between Boreal and Wells,
> as alleged by Boreal, to have an additional interest point paid
> by Boreal to Wells at the . . . closing to make sure the utility
> was paid, if that point was paid, how it was applied;
> 3. Whether Wells (intentionally or otherwise) double-dipped by
> taking both the point from Boreal and by sweeping the
> Debtor's cash collateral account to pay the same Utility bill,
> which resulted in insufficient funds to pay wages to debtors
> employees;
> 4. Whether Wells violated the cash collateral order, and/or
> breached its deal with Boreal in so doing;
>
> . . . .
>
> And, any other issues anyone wants to discuss of course.

(Affidavit of Jeffrey A. Wurst dated Dec. 14, 2009 ("Wurst Aff.") Ex. C: Email from Jeffrey

Wurst to Robert Goldman (Oct. 16, 2009, 9:29) (emphasis added).) Wells Fargo was concerned

with the catch-all "any other issue" provision and sought to confirm that only the enumerated

issues would be raised. (Wurst Aff. Ex. C: Email from Jeffrey Wurst to Robert Goldman (Oct.

16, 2009, 9:29).) The Mediator responded that he "ha[d] no clue what the case is about" and that

"we will go where the river takes us." (Wurst Aff. Ex. C: Email from Robert Goldman to Jeffrey

Wurst (Oct. 16, 2009, 11:46).) Unsatisfied, Wells Fargo replied that:

> [B]efore we can prepare any statement for you [about our legal
> position] we need to know what it is that is being submitted to
> mediation. . . . Nothing productive can be achieved from a "free
> for all" mediation. Certainly we cannot be prepared to discuss any
> issue that is not first on the proverbial table. . . . We will be

3

prepared to discuss only the . . . items enumerated. . . . In the event any additional issues are raised we will address them at the mediation only if we feel we are able to without the benefit of reviewing any documents or other preparation.

(Wurst Aff. Ex. C: Email from Jeffrey Wurst to Robert Goldman (Oct. 16, 2009, 16:53).)

Wells Fargo was also concerned that Boreal would fail to send a client representative. To that end, Wells Fargo stated that "neither Wells Fargo nor its counsel will attend any mediation where Wells Fargo is the only party with client presence" because "absent the participation of a Boreal business person nothing can be accomplished." (Wurst Aff. Ex. E: Email from Jeffrey Wurst to Robert Goldman (November 13, 2009, 14:32).) The mediator responded that "[i]t is my understanding that all parties will have a party representative present" but declined to provide any further assurances. (Wurst Aff. Ex. E: Email from Robert Goldman to Jeffrey Wurst (November 13, 2009, 15:00).)

III. The Mediation

The mediation was held on November 17, 2009 at the United States Bankruptcy Court in Poughkeepsie and was attended by Wells Fargo Vice President Evan Zwerman ("Zwerman") and Ruskin attorney Daniel McAuliffe ("McAuliffe"). (McAuliffe Aff. ¶ 2.) Although Zwerman did not have unlimited settlement authority, he had the authority to settle the dispute for up to the amount in controversy. (Zwerman Aff. ¶ 6.)

The mediation reached an impasse soon after it began. As counsel for Boreal offered a short summary of its position, McAuliffe interjected to express disagreement.[1] (Hr'g

---

[1] Due to the confidential nature of the mediation, the Bankruptcy Court cautioned the parties at the December 31 hearing to speak only in general terms. has created considerable ambiguity in the record, and the above statement of facts is therefore necessarily vague. However, it appears that the particular point about which Wells Fargo interjected related to whether "the increase in Boreal's interest rate was linked to a payment to NYSEG." A.T. Reynolds, 424 B.R. at 80.

4

Tr. dated Dec, 31, 2009 ("12/31 Tr.") Tr. 81.) The Mediator requested that McAuliffe momentarily reserve his point. But McAuliffe persisted. The Mediator then spoke to the Wells Fargo representatives alone in a side session to circumvent the "complete roadblock." (12/31 Tr. 82-83.) That side session lasted over an hour. And McAuliffe reiterated to the Mediator that Wells Fargo would not agree to any solution that involved a monetary payment. (12/31 Tr. 83.) The Mediator asserts that during the side session Wells Fargo "did not go through risk analysis, [and] [t]hey went simply to reiterate the position they walked into the room with . . . ." (12/31 Tr. 85.)

After the side session, the Mediator informed the Bankruptcy Court that one of the parties was not participating in good faith. (12/31 Tr. 143.) The mediation then reconvened, and Wells Fargo made a settlement offer that was deemed "unacceptable" by the parties. In re A.T. Reynolds & Sons, Inc., 424 B.R. 76, 80 (Bankr. S.D.N.Y. 2010). This offer "came after McAuliffe and Zwerman spent an extended period on the phone with an unidentified person, out of the presence of the mediator." A.T. Reynolds, 424 B.R. at 80-81. McAuliffe states that during this call he "discuss[ed] the severity of the allegations with [his] colleagues." (McAuliffe Aff. 4 n.2.)

Wells Fargo does not dispute this basic chronology but characterizes events differently. Zwerman maintains that Wells Fargo approached the mediation with an open mind, intending to "listen to the parties that were attending the mediation, see what relevant facts were going to be brought up, [and] to make a decision one way or the other." (12/31 Tr. 34.) According to Zwerman, he and McAuliffe considered Wells Fargo's exposure to risk, and their "conclusion was that . . . what was presented to us did not make sense and that our exposure was zero . . . ." (12/31 Tr. 43.) McAuliffe denies interrupting Boreal's counsel during the mediation.

5

(12/31 Tr. 34.)

Based on the above events, the mediator submitted a report to the Bankruptcy

Court detailing the allegations of bad faith, including the following:

> 3. When supplied with . . . a statement [of legal issues] by counsel to [A.T. Reynolds], Wells Fargo objected to language to the effect that the mediation might cover "any other issues anyone wants to discuss, of course";
> 4. Wells Fargo demanded to know the identities of the individuals who would attend the mediation;
> 5. Wells Fargo expressed concern that if its demands were not complied with, then the mediation would be a "free for all" which would "waste everybody's time";
>
> . . . .
>
> 7. McAuliffe attended the mediation "prepared only to repeat a pre-conceived mantra that indicated that Wells Fargo was not open to any compromise that would involve 'taking a single dollar out of their pocket'";
> 8. The Mediator's attempts to see if there was any credibility to the concept that the increase in Boreal's interest rate was linked to a payment to NYSEG were deflected by McAuliffe's repeating his mantra;
>
> . . . .
>
> 10. Wells Fargo's only offer came after the hearing in which the Court stated the consequences of bad faith, and such offer was "unacceptable" to the other parties; and
> 11. The offer came after McAuliffe and Zwerman spent "an extended period on the phone with an unidentified person, out of the presence of the mediator."

A.T. Reynolds, 424 B.R. at 76.

The Mediator made no findings regarding Zwerman's authority to settle the case.

Based on the Mediator's report, the Bankruptcy Court sua sponte ordered that Wells Fargo show

cause why it should not be sanctioned for failure to comply with the Mediation Order. (Docket

No. 231.) That Order precipitated a voluminous submission from Wells Fargo and a contentious

6

evidentiary hearing on December 31, 2009 that drew all of the participants in the mediation into its vortex.

IV.  The Bankruptcy Court's Decision

Based on the foregoing, the Bankruptcy Court found that Wells Fargo had failed to participate in the mediation in good faith.  As an initial matter, the Bankruptcy Court held that:

> Passive attendance at mediation cannot be found to satisfy the meaning of participation in mediation, because mediation requires listening, discussion and analysis among the parties and their counsel.  Adherence to a predetermined resolution, without further discussion or other participation, is irreconcilable with risk analysis, a fundamental practice in mediation. . . .  [T]his Court has authority to order the parties to participate in the process of mediation, which entails discussion and risk analysis.

A.T. Reynolds, 424 B.R. at 85-86 (emphasis added).  Accordingly, the Bankruptcy Court held that "attendance without participation in the discussion and risk analysis . . . constitutes failure to participate in good faith."  A.T. Reynolds, 424 B.R. at 89.

In the Bankruptcy Court's view, Wells Fargo exhibited bad faith for three reasons. First, it failed to participate in the process of mediation meaningfully because it "insisted on being dissuaded of the supremacy of its legal obligation, in lieu of participating in discussion and risk analysis."  A.T. Reynolds, 424 B.R. at 91.  Of particular concern was the fact that "Wells Fargo would not discuss whether there was any link between two substantive events in the case, and . . . its counsel squashed any potential legal debate by interrupting counsel to Boreal when he attempted to discuss such a link."  A.T. Reynolds, 424 B.R. at 91.

Second, the Bankruptcy Court found that Zwerman did not have authority to settle the matter because (i) he only had authority to settle for a "predetermined amount," despite the "very real possibility that the amount in controversy might have turned out to be in excess of

7

$35,000"; (ii) he was only prepared to discuss predetermined legal issues; (iii) he did not "appear to have had the authority to enter into creative solutions that might have been brokered by the Mediator"; and (iv) "a pivotal decision was made by an absent person." A.T. Reynolds, 424 B.R. at 93-94.

Third, the Bankruptcy Court found that Wells Fargo "sought to control the procedural aspects of the mediation by resisting filing a mediation statement and demanding to know the identities of the other party representatives." A.T. Reynolds, 424 B.R. at 92.

Based on these findings, the Bankruptcy Court sanctioned Wells Fargo and Ruskin pursuant to Fed. R. Civ. P. 16(f) and held them in contempt for violation of the terms of the Mediation Order.

## DISCUSSION

I. Legal Standard

Fed. R. Civ. P. 16(f) provides that a court may sanction a party or its attorney for failure to obey a pretrial order of the Court. A bankruptcy court's award of sanctions may be set aside only for abuse of discretion. In re Kalikow, 602 F.3d 82, 91 (2d Cir. 2010). A court abuses its discretion "if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Kalikow, 602 F.3d at 91. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 168 (2d Cir. 2003). A court also abuses its discretion "if its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." Zervos,

8

252 F.3d at 169.

    While contempt orders are also reviewed for abuse of discretion, "review of a contempt order is more exacting than under the ordinary abuse-of-discretion standard because a [bankruptcy] court's contempt power is narrowly circumscribed." Perez v. Danbury Hosp., 347 F.3d 419, 423 (2d Cir. 2003).


II. Sanctions

  A. Good Faith Participation in Court-Ordered Mediation

    Mediation is typically a voluntary process. In a mandatory court-ordered mediation, however, adversary parties are forced to participate in a collaborative process that one or both parties may not desire. As a result, some states and commentators have adopted or proposed a requirement that parties to a mandatory mediation participate in "good faith." See generally John Lande, Using Dispute System Design Methods to Promote Good-Faith Participation in Court-Connected Mediation Programs, 50 UCLA L. Rev. 69 (2002). Courts have not developed any clear standards for evaluating good faith in court-ordered mediation. Nevertheless, "courts have interpreted good faith narrowly to require compliance with orders to attend mediation, provide pre-mediation memoranda, and, in some cases, produce organizational representatives with sufficient settlement authority." Lande, 50 UCLA L. Rev. at 84; see also Seidel v. Bradberry, 94 Civ. 0147, 1998 WL 386161, at *3 (N.D. Tex. July 7, 1998) (imposing sanctions for failing to attend a court-ordered mediation); Nick v. Morgan's Foods, Inc., 270 F.3d 590, 597 (8th Cir. 2001) (imposing sanctions for, inter alia, failing to submit a pre-mediation memorandum); Francis v. Women's Obstetrics & Gynecology Grp., P.C., 144 F.R.D. 646, 648 (W.D.N.Y. 1992) (same).

Advocates of a good faith standard argue that it forces adversary parties to take the mediation seriously, and avoids the risk of "pro forma" mediation where parties participate only to the minimal extent necessary to fulfill the court's requirements. See Kimberlee K. Kovach, Good Faith in Mediation, 38 S. Tex. L. Rev. 575, 595 (1996). On the other hand, a good faith standard poses several problems. First, "[g]ood faith is an intangible and abstract quality with no technical meaning or statutory definition . . . ." Black's Law Dictionary (5th ed. 1979). Of further concern is the tension between inquiring into good faith while preserving the confidential nature of a mediation. Kovach, 38 S. Tex. L. Rev. at 601; Edward F. Sherman, Court-Mandated Alternative Dispute Resolution: What Form of Participation Should be Required, 46 SMU L. Rev. 2079, 2093 (1993). Participants—including the mediator—are typically prohibited from divulging statements made during the course of the mediation. See Procedures Governing Mediation, General Order M-390 § 5.1. Yet if allegations of bad faith arise, a court must investigate those allegations, endangering the mediation's confidentiality. Kovach, 38 S. Tex. L. Rev. at 601; Edward F. Sherman, Court-Mandated Alternative Dispute Resolution: What Form of Participation Should be Required?, 46 SMU L. Rev. 2079, 2093 (1993). Finally, inquiry into the parties' conduct in a mediation, backed by the threat of sanctions, may exact a coercive influence on the parties to settle. See Sherman, 46 SMU L. Rev. at 2093. These considerations guide this Court's review of the proper scope of the good faith standard.

The Bankruptcy Court found that Wells Fargo failed to mediate in good faith because it (1) did not "participate" sufficiently in the process of mediation, which in the Bankruptcy Court's view entails "discussion" and "risk analysis"; (2) did not send a representative with settlement authority, and (3) attempted to control the procedural aspects of

10

the mediation.

B.  "Participation" During Mediation Proceedings

Most courts that have addressed allegations of insufficient "participation" during

mediation proceedings (i.e., the degree to which a party discusses the issues, listens to opposing

viewpoints, analyzes its risk of liability, and generally participates in the "process" of

mediation)[2] have declined to find a lack of good faith.  See, e.g., Graham v. Baker, 447 N.W.2d

397, 401 (Iowa 1989) (sanctions inappropriate despite the fact that party's behavior "ranged

between acrimony and truculency [and] precluded any beneficial result to the parties from the

mediation process"); Stoehr v. Yost, 765 N.E.2d 684, 687 (Ind. App. 2002) (no bad faith despite

allegation that party was unwilling to "really listen" to arguments of the opposing party).  But

see Brooks v. Lincoln Nat. Life Ins. Co., No. 05 Civ. 118 (WJR), 2006 WL 2487937, at *4 (D.

Neb. Aug. 25, 2006) (finding bad faith where party "(1) indicat[ed] [she] would not respond to

the defendants' initial offer and direct[ed] the mediator to tell defendants they had five minutes

to put a serious settlement offer on the table or [she] was leaving, (2) indicat[ed] defendants'

second offer or proposal was unacceptable and unworthy of response, (3) [did] not allow[] the

mediator to explain the defendants' offers, (4) [did] not engage[e] in dialogue with defendants'

counsel to correct what [her] counsel perceived as deficiencies in the mediation process, and (5)

unilaterally terminat[ed] or abandon[ed] the mediation process").  Still, these courts declined to

elucidate a standard for good faith participation during mediation.

In determining the appropriate scope of inquiry into good faith participation

during mediation, this Court is guided by considerations of litigant autonomy and confidentiality

---

[2] "Participation" in this regard is distinct from such objective criteria as attendance, exchange of
pre-mediation memoranda, and settlement authority, which several courts have found to be
elements of good faith in court-ordered mediation.

11

in mediation proceedings. It is well-settled that a court cannot force a party to settle, nor may it invoke "pressure tactics" designed to coerce a settlement. Kothe v. Smith, 771 F.2d 667, 669 (2d Cir. 1985). Moreover, in an analogous context, although a court may require parties to appear for a settlement conference, see, e.g., Bulkmatic Transport Co. v. Pappas, 99 Civ. 12070 (RMB) (JCF), 2002 WL 975625, at *2 (S.D.N.Y. May 9, 2002), it may not coerce a party into making an offer to settle. See Dawson v. United States, 68 F.3d 886, 987 (5th Cir. 1995) ("[T]here is no meaningful difference between coercion of an offer and coercion of a settlement: if a party is forced to make a settlement offer because of threat of sanctions, and the offer is accepted, a settlement has been achieved through coercion."). And a party is within its rights to adopt a "no-pay" position. Negron v. Woodhull Hosp., 173 F. App'x 77, 79 (2d Cir. 2006) (party was "free to adopt a 'no pay' position" at a court-ordered mediation).

Thus, contrary to the Bankruptcy Court's determination, Wells Fargo was within its rights to enter the mediation with the position that it would not make a settlement offer. It was also within its rights to "predetermine[] that it was not liable" and to "insist[] on being dissuaded of the supremacy of its legal position." A.T. Reynolds, 424 B.R. at 92. A contrary holding would be directly at odds with a party's right to adopt a "no pay" position in settlement negotiations.[3]

Although parties to a mediation must listen courteously to opposing arguments and respond in kind, ultimately the benefits of enforcing such participation by threat of sanctions are dwarfed by the significant potential for harm. Where parties do not want to settle, inquiry into a minimal level of participation (beyond objective criteria such as attendance, exchange of

---

[3] Indeed, rather than being hostile to mediation, "dissuasion" is in fact the core of the process, particularly in a mandatory mediation where the parties are participating only by reason of a court order. It should be presumed that each party enters a mediation confident in the strength of its legal position, and a settlement will result only if the mediator is able to persuade both parties to meet somewhere in between.

pre-mediation memoranda, and settlement authority) backed by threat of sanctions forces unwilling parties to engage each other civilly to satisfy a court order. But ultimately, mediation will only succeed if the parties themselves want it to, and a court's order to mediate—even in good faith—will not change the mind of party who believes that settlement is not in their best interest. Certain disputes are simply not amenable to mediation, and it should not be a surprise when attempts to mediate them quickly deteriorate. Such a case exists where, as here, there exists a strongly contested threshold factual issue—the source of the Utility Payment—that may be fully determinative of a party's liability.

This Court does not share the Bankruptcy Court's view that the standard for determining participation is "risk analysis." Risk analysis is often an internal process, and it is difficult—if not impossible—to distinguish between a party that refuses to consider a given risk from a party that analyzes the risk and determines that the risk is zero. Indeed, this is precisely the rationale given by Wells Fargo. Zwerman testified that "[o]ur conclusion was that . . . what was presented to us did not make sense and that our exposure [to risk] was zero . . . ." (Tr. 43.) Thus, Wells Fargo did not forego risk analysis merely because it determined that it was not liable and adhered to this position at the mediation; such conduct is entirely consistent with a rational analysis of risk.

Inquiring into the parties' level of participation also imperils the confidentiality of mediation. This is illustrated by the present dispute. Throughout the sanctions hearing, the Bankruptcy Court was forced to determine the facts relevant to participation while shielding itself from the confidential aspects of the proceedings. The Bankruptcy Court consistently admonished the witnesses to refrain from discussing specific details of the mediation. (See, e.g., 12/31 Tr. 55 ("Please try to stay general. I don't want to be tainted . . . ."); 12/31 Tr. 59 ("Let's

13

not go into the mediation. This is a risk analysis. All Mr. Goldman was doing was risk

analysis. . . . [L]et's go general here. He didn't agree with the risk analysis . . . . [T]hat's what

you want to be saying"); 12/31 Tr. 83 ("I want you to emphasize and talk to me about the

mediation process, not the offers, not what's going on, but the mediation process.").) But

ultimately, confidential information was communicated to the Court. (See 12/31 Tr. 100 ("Do

not again talk . . . about the dollar value. Even though I have now sort of become of aware of

this stuff, I'm trying my best not . . . to be.").) Moreover, the necessary exclusion of confidential

information from the hearing had the unintended—but unavoidable—effect of excluding relevant

facts, such as the specific issues discussed at the mediation and the parties' legal and factual

positions. (See 12/31 Tr. 133-34).

           Accordingly, this Court holds the confidentiality considerations preclude a court

from inquiring into the level of a party's participation in mandatory court-ordered mediation, i.e.,

the extent to which a party discusses the issues, listens to opposing viewpoints and analyzes its

liability.[4] This holding provides a clear and objective standard with minimal intrusion into

confidentiality and a party's right to refuse to settle. This holding is also consistent with the

general pattern of interpretation by the courts, which "have interpreted good faith narrowly to

require compliance with orders to attend mediation, provide pre-mediation memoranda, and, in

some cases, produce organizational representatives with sufficient settlement authority." Lande,

50 UCLA L. Rev. at 84. Accordingly, the Bankruptcy Court's determination that Wells Fargo

did not "participate" in the mediation in good faith was clearly erroneous.

---

[4] This does not mean that all conduct in a mandatory mediation is outside the scope of a court's inquiry into good faith. Where, for example, a party demonstrates dishonesty, intent to defraud, or some other improper purpose, the benefits of inquiry into such conduct may outweigh considerations of coercion and confidentiality. But no such allegations have been presented here and, accordingly, this Court does not reach this issue.

14

### C. Settlement Authority

The Bankruptcy Court also found that Wells Fargo failed to send a representative with sufficient settlement authority. Several courts have found that a failure to send a representative with settlement authority to a mediation illustrates a lack of good faith warranting sanctions. See, e.g., Nick, 270 F.3d at 597; Raad v. Wal-Mart Stores, Inc., 97 Civ. 3015 (JK), 1998 WL 272879, at *1 (D. Neb. May 6, 1998). This Court agrees that such conduct may constitute a lack of good faith.

Here, however, in requiring Zwerman to have had the ability to (1) settle this case for any amount, including an amount greater than the amount in controversy; (2) discuss any theory of legal liability; and (3) enter into undefined "creative solutions," the Bankruptcy Court applied an unworkable and overly stringent standard for determining "settlement authority" and accordingly abused its discretion. Settlement figures are generally no more than the amount in controversy, and there is rarely a need for a party attending a mediation to have authority to settle for greater than that amount. It is also unreasonable to expect a party to be prepared to discuss every possible legal theory, including those about which it had no prior notice. Finally, large corporations operate under divisions of labor and authority, and a given "creative solution" may require approval of any number of corporate officers. A corporation cannot reasonably be expected to anticipate the virtually limitless range of "creative solutions" that might be raised at mediation. The Bankruptcy Court's standard would require attendance by a corporate officer with a degree of responsibility and control that rarely exists in a single individual.

Thus, where a mediation order requires the presence of a person with "settlement authority," a party satisfies this requirement by sending a person with authority to settle for the anticipated amount in controversy and who is prepared to negotiate all issues that can be

15

reasonably expected to arise. Here, it is undisputed that Zwerman had the authority to settle for up to the full amount in controversy. In addition, McAuliffe was prepared to advise Zwerman regarding the legal issues suggested by A.T. Reynolds as subject to discussion—a reasonable guidepost for the issues that are likely to arise. Finally, the Bankruptcy Court's finding that "a pivotal decision was made by an absent person" was clearly erroneous. The record is unambiguous that Zwerman had full authority to settle the matter. The notion that Zwerman needed to call the Wells Fargo corporate office in order to obtain permission to offer the settlement is conjecture.

Accordingly, the Bankruptcy Court's finding that Zwerman did not have "settlement authority" was clearly erroneous.

### D. Control of the Procedural Aspects of the Mediation

Finally, the Bankruptcy Court's finding that Wells Fargo attempted to "control the procedural aspects of the mediation" was also clearly erroneous. Wells Fargo ultimately submitted a mediation statement and attended the mediation, as required by the order. The issues raised by Wells Fargo in pre-mediation exchanges with the Mediator were legitimate points of concern regarding the issues to be raised in the mediation and the other parties' participation in the proceeding. There is nothing in the General Mediation Order preventing parties from raising such valid concerns.

Accordingly, The Bankruptcy Court's sanctions order was an abuse of discretion and is reversed.

16

III. Contempt

To hold a party in civil contempt, a court must find that (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner. King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995). As discussed above, the Bankruptcy Court's finding that Wells Fargo violated the terms of the Mediation Order was clearly erroneous. Accordingly, the Bankruptcy Court's contempt order was an abuse of discretion and is reversed.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Order imposing sanctions and holding Appellant Wells Fargo in contempt is reversed.

Dated: March 18, 2011
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record*

17